# EXHIBIT 11

JUNE 2020

# CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL

## REVIEW OF THE CHICAGO POLICE DEPARTMENT'S MANAGEMENT AND PRODUCTION OF RECORDS



JOSEPH M. FERGUSON, INSPECTOR GENERAL FOR THE CITY OF CHICAGO
DEBORAH WITZBURG, ACTING DEPUTY INSPECTOR GENERAL FOR PUBLIC SAFETY

# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ............................................................................................. 4
II.     BACKGROUND ....................................................................................................... 6
        A.    LEGAL AND CONSTITUTIONAL OBLIGATIONS ............................................ 6
        B.    CASE STUDIES ....................................................................................... 8
        1.    *FIELDS V. CITY OF CHICAGO*, No. 10CV01168 (N.D. Ill. filed February 22, 2010) ..................... 9
        2.    *CAZARES AND MANZERA V. FRUGOLI*, No. 13CV5626 (N.D. Ill. filed August 7,
              2013) ........................................................................................... 10
        3.    *YOUNG V. CITY OF CHICAGO*, No. 13CV5651 (N.D. Ill. filed August 8, 2013) ..................... 11
        4.    EXTERNAL REVIEW CONDUCTED FOR THE DEPARTMENT OF LAW ................ 12
        C.    CPD'S RECORDS STORAGE PRACTICES ..................................................... 13
        D.    CPD'S PRODUCTION PROCESSES .......................................................... 14
        1.    SUBPOENAS FOR CRIMINAL LITIGATION .......................................... 14
        2.    ALTERNATIVE PROCESSES ............................................................. 16
        E.    CPD'S DIRECTIVES .................................................................................. 17
III.    OBJECTIVES, SCOPE, AND METHODOLOGY ........................................................... 20
        A.    OBJECTIVES ............................................................................................ 20
        B.    SCOPE .................................................................................................... 20
        C.    METHODOLOGY ................................................................................... 20
        D.    STANDARDS ......................................................................................... 21
        E.    AUTHORITY AND ROLE ......................................................................... 22
IV.     FINDING AND RECOMMENDATIONS ..................................................................... 23
        FINDING: CPD CANNOT ENSURE THAT IT IDENTIFIES AND PRODUCES ALL
              RELEVANT RECORDS IN ITS POSSESSION AS REQUIRED. ......................... 23
        A.    RISKS TO CPD'S ABILITY TO ENSURE THAT IT IDENTIFIES AND PRODUCES ALL
              APPROPRIATE RECORDS ..................................................................... 24
        1.    IDENTIFICATION OF RECORDS .......................................................... 24
        2.    PRODUCTION PROCESSES ............................................................. 27
        3.    LACK OF REVIEW ........................................................................... 28
        B.    CPD'S MANAGEMENT OF RECORDS LACKS CONSISTENT AND
              COMPREHENSIVE GUIDANCE .......................................................... 29
        C.    STAKEHOLDERS LACK CONFIDENCE IN CPD'S ABILITY TO MEET ITS
              CONSTITUTIONAL AND LEGAL OBLIGATIONS ..................................... 30
APPENDIX A: OIG-IDENTIFIED RECORDS POTENTIALLY RELATED TO CRIMINAL
        PROSEUCTION AND CIVIL LITIGATION ARISING OUT OF LAW ENFORCEMENT
        ACTIVITIES ............................................................................................................. 39
APPENDIX B: CPD'S RESPONSE .............................................................................................. 54

## ACRONYMS

| | |
|---|---|
| BIA | Bureau of Internal Affairs |
| CHRIS | Criminal History Records Information System |
| CLEAR | Civilian and Law Enforcement Analysis and Reporting |
| CPD | Chicago Police Department |
| CR | Complaint Register |
| DOL | Department of Law |
| FCRL | Federal Civil Rights Litigation Division |
| OIG | Office of Inspector General |
| OLA | Office of Legal Affairs |
| RD | Records Division |

**CITY OF CHICAGO
OFFICE OF INSPECTOR GENERAL**

# REVIEW OF THE CHICAGO POLICE DEPARTMENT'S MANAGEMENT AND PRODUCTION OF RECORDS



The Chicago Police Department (CPD) lacks standard, management-driven practices to ensure that all records responsive to a records request are produced.



CPD's record management and production processes are inadequate to ensure the Department can meet its constitutional and other legal obligations.

CPD is unable to effectively determine what records exist, making it impossible to know whether it has identified and produced all relevant records.

   

Of the 15,252 subpoenas tracked within the Subpoena Unit's database between June 2019 and August 2019, 74% were never forwarded to other CPD units to retrieve related records.

CPD also lacks appropriate review processes to ensure that materials are properly produced, which risks the disclosure of materials that may raise privacy and public safety concerns.



# I.   EXECUTIVE SUMMARY

The Office of Inspector General (OIG) has completed a review of the Chicago Police Department's (CPD or the Department) processes for managing and producing its records for criminal prosecution and civil litigation arising out of law enforcement activities. CPD is involved in both criminal and civil litigation, since its investigations and corresponding records are used as evidence in both types of proceedings. CPD, both directly and as an entity acting on the government's behalf in a criminal case, is required by law and the United States Constitution to disclose evidence in its possession, with certain exceptions; those obligations include but are not limited to those enumerated in *Brady v. Maryland* and *Giglio v. United States* and their progeny, Illinois state law, and Court-promulgated rules of civil procedure.[1]

OIG found that CPD's processes for identifying and producing records are inadequate to comply with its constitutional and other legal obligations due to the following:

- CPD's Subpoena Unit and Office of Legal Affairs (OLA), the units responsible for responding to subpoenas and records requests, cannot ensure that they are identifying and locating all responsive records for production. The Department lacks the means to determine what records may exist for any case or incident, making it impossible to know whether it has identified and produced all relevant records.
- When receiving a request for "any and all" relevant records (i.e., requests with broad language) including but not limited to certain specific records, Subpoena Unit members routinely fail to conduct a thorough search beyond the specific categories of records enumerated, in order to satisfy the broader request.
- When the Subpoena Unit receives subpoenas with broad language, members routinely do not attempt to identify paper records, as they cannot determine which of CPD's units may hold such records.
- CPD does not systematically track its production of records. Records produced by individual CPD members, as well as records from CPD units sent directly to litigants, are not uniformly recorded, or otherwise documented in a comprehensive tracking system.
- CPD does not have adequate processes in place to ensure that records it produces are relevant to the case for which those records are being requested (e.g., CPD may produce body-worn camera footage including hours of footage involving non-related incidents). Additionally, CPD processes lack clarity as to who bears responsibility for notifying OLA to review responsive records, and when such notification can or must occur; this risks the disclosure of records

---

[1] See *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972), *Kyle v. Whitley*, 514 U.S. 419 (1995), 725 ILCS 5/114-13, Ill. Sup. Ct. R. 201, [1] Fed. R. Civ. P. 26.

which may raise privacy and public safety concerns.

OIG conducted interviews with 19 CPD members and 20 stakeholders to collect data for this report. OIG found that the stakeholders, including judges, prosecutors, defense attorneys, and civil rights attorneys, based on direct observation and experience, regard CPD's records management and production processes to be ineffective. Retrieving records from CPD generally requires multiple production requests to various CPD units and members. Stakeholders expressed frustration with the large variations in time for CPD to produce its records—production for some cases may take a few months while for other cases it may take years—and a lack of confidence in CPD to produce all appropriate records at all. Some stakeholders found it difficult to communicate with CPD to resolve these issues.

OIG concluded that CPD's records management and production processes are inadequate to meet its constitutional and legal obligations. To correct the existing problems, OIG recommended that CPD develop Department-wide records management and production policies, procedures, and trainings to ensure that CPD members understand their own, the Department's, and the Cook County State's Attorney's legal and constitutional obligations to effectively identify and produce records. Additionally, CPD should develop and implement a records management system that allows for the effective and efficient identification of records across CPD's various units, systems, and physical locations. Finally, OIG recommends improved communication, coordination, and transparency with stakeholders to develop these policies, procedures, trainings, and systems, and to resolve any issues moving forward.

CPD agreed with most of OIG's recommendations regarding its production of records. OIG commends CPD for its proactive development of an upcoming records production directive and standard operation procedures within units. CPD agreed to audit its production processes and to capture those processes in its ongoing Department-wide staffing analysis. With respect to certain recommendations which CPD did not agree to implement, such as those relating to the automation of all records, the Department cited concerns over staffing and resource scarcity. While CPD's implementation of a software solution to improve production-related tracking and communications is commendable, OIG notes that the improved tracking of subpoena responses does not result in improved quality or completeness of subpoena responses; that is, CPD's efforts to improve production-related tracking and communication does not address its inability to ensure that it is identifying all relevant records so that they may be produced. OIG continues to encourage CPD to provide consistent, enterprise-wide, management-driven guidance to its constituent units and to address the identification and review issues highlighted herein. OIG's

specific recommendations, and CPD's responses, are described in the "Finding and Recommendations" section of this report.[2]

# II.   BACKGROUND

CPD is involved in both criminal prosecution and civil litigation arising out of law enforcement activities, as its investigations and corresponding records are used as evidence in both types of proceedings. In order to prepare for trial and retrieve all relevant records including those from CPD, litigants engage in pretrial discovery, a process by which they exchange records in order to comply with their constitutional and court-imposed disclosure obligations.[3] An incomplete or untimely exchange of records may constitute a violation of the Constitution as well as procedural obligations mandated by law. Such violations may have adverse impacts on litigants' ability to make strategic and well-informed decisions (e.g., whether to plead guilty or go to trial), as well as the quality of justice (e.g., exculpatory records not being produced for trial).[4]

## A.   LEGAL AND CONSTITUTIONAL OBLIGATIONS

CPD, both directly and as an entity acting on the government's behalf in a criminal case, is required by law and the United States Constitution to disclose evidence in its possession, with certain exceptions; those obligations include but are not limited to those enumerated in *Brady v. Maryland* and *Giglio v. United States* and their progeny, the Illinois Rules of Civil and Criminal Procedure, and Court-promulgated rules.

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the

---

[2] The publication of this report with CPD's response triggers the provision of the Municipal Code of Chicago mandating that, at the request of three or more aldermen, the chair of the Committee on Public Safety hold a hearing to receive testimony from the superintendent or his designee in response to questions concerning the Department's response to this report.  MCC § 2-56-245.

[3] Discovery also includes exchanges of other forms of evidence; however, only records are within the scope of this report. "How Courts Work," American Bar Association, accessed November 14, 2019, https://www.americanbar.org/groups/public_education/resources/law_related_education_network/how_courts_work/discovery/.

[4] Exculpatory evidence is "evidence that goes towards negating a defendant's guilt, that would reduce a defendant's potential sentence, or evidence going to the credibility of a witness." While the prosecution is required to disclose all material exculpatory evidence even without affirmatively being asked to do so, defense attorneys also attempt to retrieve government records directly to ensure that all relevant records were disclosed. "Brady Rule," Legal Information Institute, Cornell Law School, accessed November 14, 2019, https://www.law.cornell.edu/wex/brady_rule.

good faith or bad faith of the prosecution."[5] In *Giglio*, the Supreme Court explicitly drew the scope of required disclosure to include evidence affecting the credibility of a witness.[6] In this context, notably, this would include information related to the disciplinary history of an officer who might serve as a witness. Subsequent caselaw makes clear that the constitutionally-derived obligations are not limited in reach to prosecutors' offices, but rather that a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[7]

Outside of federal constitutional jurisprudence, CPD is directly and explicitly required by State law to identify and produce material in its possession. Pursuant to the Illinois Rules of Criminal Procedure,

> Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated. In addition, the investigating agency shall provide to the prosecuting authority any material or information, including but not limited to reports, memoranda, and field notes, within its possession or control that would tend to negate the guilt of the accused of the offense charged or reduce his or her punishment for the homicide offense. Every investigative and law enforcement agency in this State shall adopt policies to ensure compliance with these standards. Any investigative, law enforcement, or other public agency responsible for investigating any "non-homicide felony" offense or participating in an investigation of any "non-homicide felony" offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports and memoranda that have been generated by or have come into the possession of the investigating agency concerning the "non-homicide felony" offense being investigated. In addition, the investigating agency shall provide to the prosecuting authority any material or information, including but not limited to reports and memoranda, within its possession or control that would tend to negate the guilt of the accused of the "non-homicide felony" offense charged or reduce his or her punishment for the "non-

---

[5] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).
[6] *Giglio v. U.S.*, 405 U.S. 150, 154 (1972).
[7] *Kyle v. Whitley*, 514 U.S. 419, 437 (1995).

homicide felony" offense. This obligation to furnish exculpatory evidence exists whether the information was recorded or documented in any form. Every investigative and law enforcement agency in this State shall adopt policies to ensure compliance with these standards.[8]

Furthermore, both federal and state courts operate pursuant to legally promulgated rules to govern processes and parties' obligations in discovery entitling litigants to obtain appropriate material relevant to their claim. Failure to comply with discovery rules may result in the imposition of sanctions against the noncompliant litigant, including findings of contempt, possible financial penalties, and adverse rulings on evidence and claims.

Specifically, pursuant to Illinois Supreme Court Rule 201, a party to civil litigation "may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking disclosure or of any other party, including the existence, description, nature, custody, condition, and location of any documents or tangible things, and the identity and location of persons having knowledge of relevant facts."[9] Pursuant to the Federal Rules of Civil Procedure, "[u]nless otherwise limited by court order...[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and are required to make certain disclosures even absent a request to do so.[10]

In addition to these intrinsic obligations, CPD is subject to requests for and orders to produce records of various kinds. During criminal litigation, the prosecution and defense obtain CPD records during the discovery process via subpoenas *duces tecum* issued to the Department, which require CPD to produce relevant items and records.[11] During discovery for civil litigation, litigants obtain CPD records via records requests issued to the Department.[12]

## B.   CASE STUDIES

CPD's ability to identify and produce records is a critical underpinning of the discovery process in both criminal and civil litigation. The case studies below illustrate adverse consequences of CPD's failure to adequately identify and produce its records; the specific records management processes discussed in these case studies may not

---

[8] 725 ILCS 5/114-13(b).
[9] Ill. Sup. Ct. R. 201(b)(1).
[10] Fed. R. Civ. P. 26(b)(1).
[11] A subpoenas *duces tecum* requires the recipient to produce records. "Subpoena duces tecum," Legal Information Institute, Cornell Law School, accessed November 14, 2019, https://www.law.cornell.edu/wex/subpoena_duces_tecum.
[12] OLA referred to these records requests as "information requests."

reflect current CPD practices, as these are historical cases and their outcomes do not reflect any remedial efforts CPD has undertaken.

1. *FIELDS V. CITY OF CHICAGO*, No. 10CV01168 (N.D. Ill. filed February 22, 2010)

In *Fields v. City of Chicago,* a lawsuit filed in 2010 arising out of an overturned prosecution, it emerged that CPD had not produced all relevant records during Nathson Fields' original criminal trial three decades earlier.[13] As a result, the federal judge hearing the civil suit granted Fields' attorney, Candace Gorman, the authority to review 500 "street files" found inside CPD's old Wentworth Area Headquarters dating from 1979 to 2006.[14] Gorman compared the contents of the street files to records which the prosecution and CPD had produced for defendants during criminal prosecutions.[15] Gorman reviewed 60 cases and found that more than 90% of the information found in the street files was not included in the materials produced to defendants, including witness accounts.[16] Ultimately, the judge imposed a $70,000 sanction against the City.[17] Additionally, Gorman's team has worked towards identifying other potentially affected parties to determine whether CPD was in possession of evidence which was never produced during those parties' criminal proceedings. Any other instances of incomplete disclosure could pose further risk to the City.[18]

---

[13] General Progress Reports (detective notes) were not all produced during criminal proceedings but were later discovered in the civil trial.

[14] "Street files" is an unofficial term referring to files maintained by CPD members containing typed police reports, detective notes, and other evidence. Meisner, Jason, "Old police 'street files' raise question: Did Chicago cops hide evidence?" *Chicago Tribune*, February 13, 2016, accessed November 14, 2019, https://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html.

[15] Meisner, Jason, "Old police 'street files' raise question: Did Chicago cops hide evidence?" *Chicago Tribune*, February 13, 2016, accessed November 14, 2019, https://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html.

[16] Meisner, Jason, "Old police 'street files' raise question: Did Chicago cops hide evidence?" *Chicago Tribune*, February 13, 2016, accessed November 14, 2019, https://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html.

[17] Meisner, Jason, "City attorney ordered to pay $70,000 in sanctions for El Rukn mistrial," *Chicago Tribune*, November 9, 2015, accessed November 14, 2019, https://www.chicagotribune.com/news/breaking/ct-el-rukn-mistrial-city-sanctions-met-20151109-story.html.

[18] According to CPD, the street files found inside of CPD's Wentworth Area Headquarters have now been reviewed by DOL, moved to CPD Headquarters, audited by the Bureau of Detectives, and converted to electronic files.

2. *CAZARES AND MANZERA V. FRUGOLI*, No. 13CV5626 (N.D. Ill. filed August 7, 2013)

In 2012, former CPD Officer Joseph Frugoli was convicted of aggravated driving under the influence and leaving the scene of a fatal accident.[19] The families of Frugoli's two victims filed a wrongful death lawsuit against the City.[20] During pretrial discovery, CPD produced Frugoli's disciplinary or complaint register (CR) history, which indicated that CPD had not sustained any of the 20 complaints that had been filed against Frugoli.[21] On the stand in the civil suit, however, Frugoli's testimony contradicted that CPD had sustained disciplinary charges against him more than two decades earlier, and that he had been suspended without pay.[22]

Counsel for the City requested that CPD conduct a new search for previously undiscovered records related to Frugoli's discipline. CPD's Bureau of Internal Affairs (BIA) conducted another search, similar to the one conducted during the pretrial discovery period, for the missing sustained CR. BIA searched three databases containing CR information. However, after running the searches, BIA was unable to locate Frugoli's 25-year-old sustained CR.[23]

Ultimately, CPD located records related to the CR number at issue. CPD relied on the recollection of a CPD paralegal who remembered a screen in a retired Citizen and Law Enforcement Analysis and Reporting (CLEAR) application that contained information related to disciplinary actions which impacted officers' pay.[24] Since Frugoli's sustained CR resulted in a suspension without pay, that CLEAR application included the CR number, which had been previously undisclosed and which had not

---

[19] Meisner, Jason, "Chicago to pay $20 million to settle code-of-silence lawsuit over fatal crash caused by drunken cop, sources say," *Chicago Tribune*, December 19, 2017, accessed November 14, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-cop-fatal-dui-settlement-20171218-story.html.

[20] Meisner, Jason, "Chicago to pay $20 million to settle code-of-silence lawsuit over fatal crash caused by drunken cop, sources say," *Chicago Tribune*, December 19, 2017, accessed November 14, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-cop-fatal-dui-settlement-20171218-story.html.

[21] City of Chicago's Position Paper Regarding Discovery Violation at 7, *Cazares v. Frugoli*, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.

[22] Meisner, Jason, "Chicago to pay $20 million to settle code-of-silence lawsuit over fatal crash caused by drunken cop, sources say," *Chicago Tribune*, December 19, 2017, accessed November 14, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-cop-fatal-dui-settlement-20171218-story.html.

[23] City of Chicago's Position Paper Regarding Discovery Violation at 2-7, Cazares v. Frugoli, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.

[24] CLEAR is a product procured by CPD, consisting of several modules and applications that, in part, store electronic records. In totality, CLEAR is a collection of different technologies, dating from the early 2000s to present day. City of Chicago's Position Paper Regarding Discovery Violation at 7, *Cazares v. Frugoli*, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.

appeared in any prior search of his disciplinary history.[25] BIA searched for the CR within its three CR databases again but, even with the CR number, found no related records.[26]

After BIA attempted to find Frugoli's sustained CR within its three databases, counsel for the City conducted its own search for related records. Department of Law (DOL) attorneys searched for the missing CR using CPD's Records Warehouse list, consisting of paper CR files dating from 1972 to 2004, which were stored at CPD's Records Warehouse.[27] In total, counsel found two Frugoli CRs which had not been previously disclosed, one of which was the one Frugoli had mentioned in his testimony.[28]

CPD was unable to explain why these CRs were not in one of its three CR databases. The court ordered the City to file a position paper to explain why the City did not produce these relevant responsive records. In its position paper, the City acknowledged that systems were not in place to prevent similar failures from occurring again. To avoid these issues, CPD created a tool to search for records in the three CR databases and the retired Finance Division's application in CLEAR as well as the Records Warehouse CR list.[29] Shortly after these undisclosed records came to light, the City settled the lawsuit for $20 million.[30]

3. *YOUNG V. CITY OF CHICAGO*, No. 13CV5651 (N.D. Ill. filed August 8, 2013)

In August 2018, United States Magistrate Judge M. David Weisman recommended sanctions against the City in *Young v. City of Chicago*, a lawsuit in which the plaintiff alleged that a CPD officer used excessive force in a fatal shooting.[31] According to Judge Weisman, the case had been "plagued" by discovery issues.[32] The plaintiff filed a motion for sanctions when the City produced an officer's working file after the City

---

[25] City of Chicago's Position Paper Regarding Discovery Violation at 7, *Cazares v. Frugoli*, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.
[26] City of Chicago's Position Paper Regarding Discovery Violation at 7, Cazares v. Frugoli, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.
[27] The Records Warehouse is a records storage facility used for records with long retention periods. City of Chicago's Position Paper Regarding Discovery Violation at 8, Cazares v. Frugoli, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.
[28] City of Chicago's Position Paper Regarding Discovery Violation at 8, Cazares v. Frugoli, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.
[29] City of Chicago's Position Paper Regarding Discovery Violation at 8, Cazares v. Frugoli, No. 1:13-CV-05626 (April 6, 2018), ECF No. 505.
[30] Meisner, Jason, "Chicago to pay $20 million to settle code-of-silence lawsuit over fatal crash caused by drunken cop, sources say," *Chicago Tribune*, December 19, 2017, accessed November 14, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-cop-fatal-dui-settlement-20171218-story.html.
[31] *Young v. City of Chicago*, No. 1:13-CV-5651 (N.D.Ill. Aug. 14, 2018).
[32] *Young v. City of Chicago,* No. 1:13-CV-5651 (N.D.Ill. Aug. 14, 2018).

asserted for years that the file did not exist.[33] The Magistrate's report highlighted the City's history of discovery problems and recommended "that the District Court employ its broad discretion in imposing a sanction that will address not only the specific discovery problems evident in this case, but also the City's more global discovery problems witnessed by Courts in this district. All constituents involved — Plaintiff (as well as future plaintiffs in police shooting cases), the City, the Court —are motivated to find a resolution to what appears to be a persistent issue in these types of [police misconduct] cases."[34] Magistrate Judge Weisman recommended, for the District Court's consideration, the creation of a list of records (e.g., documents, files, etc.) held by various City and state agencies (e.g., CPD, Illinois State Police, Cook County State's Attorney's Office, etc.), relevant to fatal shootings. The purpose of the list was to allow future litigants to better understand what potential records exist for shooting cases. In March 2019, United States District Judge Joan B. Gottschall accepted the recommendation that the City be required to create a list of records potentially relevant to fatal police shootings, including records created and maintained by other agencies.[35] According to CPD, DOL personnel have received training on how to use the now-completed list.

## 4.  EXTERNAL REVIEW CONDUCTED FOR THE DEPARTMENT OF LAW

Between May 2011 and February 2018, federal judges sanctioned DOL nine times over discovery issues in civil cases involving police misconduct.[36] To examine these issues, the City engaged Winston & Strawn LLP to review DOL's Federal Civil Rights Litigation Division's (FCRL) discovery procedures and practices.[37] In 2016, Winston & Strawn LLP published their review of FCRL cases and found that several factors contributed to discovery issues, including CPD's failure to identify requested records, and

---

[33] The working file was not produced because the plaintiff had requested the working file of the "evidence officer," while the technical title of relevant CPD member was "evidence coordinator" or "evidence technician." *Young v. City of Chicago*, No. 13-CR-05651 (N.D.Ill. Mar. 14, 2019)

[34] *Young v. City of Chicago*, No. 1:13-CV-5651 (N.D.Ill. Aug. 14, 2018).

[35] Judge Gottschall did not fully accept Judge Weisman's recommendations; specifically, he rejected some of Weisman's specific suggestions regarding cost allocations for attorneys' time spent reviewing the list of records. *Young v. City of Chicago*, No. 1:13-CV-5651 (N.D.Ill. Aug. 14, 2018).

[36] The Law Department's FCRL represents CPD whenever the department or a member of the department is named in a lawsuit. Meisner, Jason, "1 Law Department attorney resigns, 2 others suspended over controversial case," *Chicago Tribune*, February 2, 2018, accessed November 14, 2019, https://www.chicagotribune.com/news/breaking/ct-met-city-sanctions-withholding-evidence-cop-trial-20180202-story.html. Dan K. Webb and Robert L. Michels, "Report to City of Chicago Concerning Review of the Department of Law's Federal Civil Rights Litigation Division," Winston & Strawn LLP, July 21, 2016, accessed November 14, 2019, https://www.winston.com/images/content/1/1/v2/114276/Winston-Strawn-Report-City-of-Chicago-FCRL-Division-Review.pdf.

[37] Dan K. Webb and Robert L. Michels, "Report to City of Chicago Concerning Review of the Department of Law's Federal Civil Rights Litigation Division," Winston & Strawn LLP, July 21, 2016, accessed November 14, 2019, https://www.winston.com/images/content/1/1/v2/114276/Winston-Strawn-Report-City-of-Chicago-FCRL-Division-Review.pdf.

miscommunication between FCRL and CPD.[38] Furthermore, FCRL attorneys expressed difficulties with identifying and obtaining records from CPD, adding that CPD's OLA, the unit responsible for producing CPD records for civil litigation, "functioned more like a document pulling service than a true discovery partner." The report highlighted the complex nature of CPD's records management system and the need for additional and better communication between the two agencies.[39]

DOL refused to participate in interviews with OIG for the purposes of this review. OIG does not, therefore, comment on what measures, if any, have been taken in response to Winston & Strawn's report.[40]

## C.    CPD'S RECORDS STORAGE PRACTICES

CPD's approach to records storage is fundamental to the Department's ability to competently produce records when it is called upon to do so. CPD holds two types of records: paper and electronic (i.e., records stored in CPD's information systems).[41]

The units within CPD which create paper records are each individually and separately responsible for the storage and production of these records. CPD does not have Department-wide policies, standards, or training on records storage; therefore, each unit determines how to file and store its respective records. If paper records accumulate quickly within units or have a longer retention period, those records are stored centrally in either the Records Storage Center at CPD Headquarters or at CPD's Records Warehouse.

CPD describes electronic records as records that are stored in one of its various information systems, such as CLEAR or the Criminal History Records Information System (CHRIS).[42] CPD's Information Services Division is responsible for the maintenance of electronic records and the applications which house them.[43]

---

[38] Discovery issues unrelated to CPD included instances in which FCRL did not pursue aspects of discovery with sufficient diligence and issues related to the training and supervision of FCRL's personnel.
[39] Dan K. Webb and Robert L. Michels, "Report to City of Chicago Concerning Review of the Department of Law's Federal Civil Rights Litigation Division," Winston & Strawn LLP, July 21, 2016, accessed November 14, 2019, https://www.winston.com/images/content/1/1/v2/114276/Winston-Strawn-Report-City-of-Chicago-FCRL-Division-Review.pdf.
[40] According to CPD, the Department provides DOL with updates to any records or orders. Additionally, CPD and DOL reportedly have standing meetings to discuss cases and improve production processes.
[41] Some CPD members referred to paper and electronic records as "manual" and "automated" respectively.
[42] CHRIS consists of several applications that are used to complete and store various automated records; including, some records created by the Detectives Division during their investigations.
[43] City of Chicago, Chicago Police Department, "General Order G01-02-07 Organization and Functions of the Bureau of Technical Services," December 2017, accessed November 14, 2019,

According to a CPD list of applications, as of December 2018, 98 applications were housed within CLEAR and CHRIS, which are used to create and store various records and data.

## D.    CPD'S PRODUCTION PROCESSES[44]

### 1.    SUBPOENAS FOR CRIMINAL LITIGATION

The Subpoena Unit, a unit within the Bureau of Technical Services' Records Division, is charged with the production of CPD records responsive to subpoenas for criminal litigation. The Cook County State's Attorney's Office issues most of the subpoenas received by the Subpoena Unit, but the Subpoena Unit may receive subpoenas from other litigants, including the United States Attorney's Office, the Office of the Public Defender, and private attorneys.[45] The Subpoena Unit is staffed by 13 CPD members, including six civilians and seven sworn members.[46] When a member is assigned to the Subpoena Unit, they receive an orientation from a civilian member who has been employed in the Subpoena Unit for over 20 years; however, they do not receive any specialized legal training or training in records management and production.[47] As of March 2019, CPD procured a GovQA software system for the Subpoena Unit  to centrally store subpoena information and coordinate internal CPD production-related communications.[48]  Specifically, the GovQA system allows the Subpoena Unit to email units which may hold records responsive to a subpoena and have those units upload records onto GovQA. Notably, GovQA does not allow Subpoena Unit members to determine what records may exist responsive to a subpoena, nor where such records may be stored. The Subpoena Unit takes the following steps to identify and produce records responsive to subpoenas.

#### a)  Subpoena Intake

The Subpoena Unit estimates that it receives between 1,000 and 1,200 subpoenas each week, with a typical return date of 21 days after issuance. When litigants send subpoenas directly to other CPD units, those units are supposed to forward the subpoena to the Subpoena Unit, rather than produce the requested records directly.

---

http://directives.chicagopolice.org/directives/data/a7a57b9b-15632909-98a15-6329-2fd8a504c5b4361a.html?hl=true.

[44] The processes described below are those which were described to OIG by the Subpoena Unit, OLA, and other relevant CPD units.

[45] CCSAO and CPD leadership hold regular meetings to discuss records disclosures and discovery obligations.

[46] Staffing figure was provided in July of 2019.

[47] Subpoena Unit members did receive training on how to use the GovQA system the Subpoena Unit uses to track its production processes.

[48] Prior to the GovQA system, CPD used a CLEAR application called the "Subpoena Log," which tracked Subpoena Unit production processes. When the Subpoena Log was in use, production-related communications occurred via department mail.

When the Subpoena Unit receives subpoenas, it scans the subpoena into GovQA and adds additional reference information such as the case docket number, relevant identifiers (e.g., Records Division number), and the date the subpoena was received.

### b) Records Identification

The Subpoena Unit is responsible for identifying which records CPD holds and is obligated to produce for criminal litigation. Both sworn members and civilian members review subpoenas to identify what records are being requested, whether they are electronic or paper, and where they are stored. Subpoenas typically request records using either detailed or broad language. Subpoenas with detailed language request specific records, while subpoenas with broad language request all records related to a case. Some subpoenas and records requests include both the detailed language and the broad language (e.g., "any and all records, including the following…").

Individual members of the Subpoena Unit use different idiosyncratic, *ad hoc* processes to determine what records are responsive to a subpoena (See "Finding and Recommendations" for more details). They generally, however, use their previous individual experiences and knowledge to determine if records exist and which CPD unit maintains those records. If the requested records are electronic, then the Subpoena Unit will search for them in the corresponding system (e.g., CLEAR and CHRIS). The quality of any result would necessarily depend on the completeness and integrity of data stored in that system. If the requested records are paper records, the Subpoena Unit will forward the subpoena to the custodian of that record via GovQA (See Figure 1). If the requested records do not exist or the unit is unable to locate them, then the unit will submit a negative report (units are typically required to respond within 96 hours). After identifying relevant records, CPD units scan and upload their paper records to GovQA.

### FIGURE 1: WHO IS RESPONSIBLE FOR IDENTIFYING SUBPOENAED RECORDS?

| | | Subpoena Language | |
| --- | --- | --- | --- |
| | | Detailed | Broad |
| Type of Record | Paper | The Subpoena Unit forwards subpoenas to relevant CPD unit to retrieve the requested records | Some Subpoena Unit members do not attempt to identify paper records, while others use their experience to determine which units may have responsive records |



Source: OIG Interviews with CPD personnel.

### c) Records Production

When the Subpoena Unit has received all the records it has requested from other CPD units, and has identified all the records within CPD's information systems, Subpoena Unit staff will print those records and hand-deliver them to the appropriate court. Prior to the use of GovQA beginning in March 2019, the Subpoena Unit did not track which records it produced to litigants. Currently, GovQA tracks records that were produced from each unit and records identified by the Subpoena Unit through CPD's information systems. The Subpoena Unit does not attempt to identify relevant, responsive records created after CPD's production of records and does not conduct any ongoing search for such newly created records. Instead, CPD relies on litigants to send subsequent subpoenas to capture any records created after CPD's response to the initial subpoena.

### 2. ALTERNATIVE PROCESSES

#### a) Records Requests for Civil Litigation

OLA, within the Office of the Superintendent, is responsible for producing records responsive to requests arising from civil litigation where CPD or a CPD member is named as a defendant in a lawsuit. OLA receives records requests from DOL or outside counsel representing the City. OLA is staffed with a discovery sergeant and paralegals who are responsible for processing requests for records. The discovery sergeant does not receive any special training to complete these duties. Generally, OLA uses similar processes as the Subpoena Unit for the identification and production of records. The most substantive difference is that OLA requires DOL itself to provide detailed records requests (i.e., to specifically name the records). Another difference is that OLA does not keep any centralized record of parties' record production requests. When receiving records requests, OLA determines whether the

records being requested are electronic or paper. If paper records, OLA will send a request via Department mail to the relevant unit requesting the specific record. If the record is electronic, support staff within OLA will search through CHRIS and CLEAR to retrieve the record. Once both paper and electronic records are retrieved, paralegals mail or email the responsive records to the requesting party. Each OLA paralegal maintains paper files pertaining to these lawsuits where they track the production of records. According to CPD, after the Winston & Strawn review in 2016, CPD provided DOL direct access to its electronic systems to retrieve relevant records.[49]

### b) Notifications of CPD Members

It is a regular practice for CPD members involved in criminal investigations to meet with prosecutors to produce records directly and in-person. Through the Court Notification System, prosecutors notify detectives and officers to appear in court, or in their offices, in order to discuss a case, review records retrieved through a subpoena, and produce any outstanding records when necessary. Neither the Subpoena Unit nor the CPD member's unit track records produced in-person during these meetings with prosecutors.

## E.    CPD'S DIRECTIVES

CPD has several directives which are relevant to its records production processes, including the following:[50]

### FIGURE 2: RELEVANT CPD DIRECTIVES

| CPD Directive | Relevant Information |
|---|---|
| General Order G01-02-07 | G01-02-07, issued on December 8, 2017, states that the Records Division's Records Inquiry Section is responsible for processing subpoenas.[51] |
| Special Order S08-02 | S08-02, issued January 29, 2019, states that the Records Division will receive all subpoenas delivered to CPD. Additionally, when litigants summon an officer to appear in court or the state's attorney requests an interview, the Special Order requires the officer to produce complete and accurate reports, records, and pertinent physical evidence to the court. However, the Special |

---

[49] Due to DOL's refusal to participate in this review, OIG could not determine in detail how this process works nor the impact of this access.
[50] When OIG spoke to CPD members with records production responsibilities about Department policies, members did not mention any of these.
[51] City of Chicago, Chicago Police Department, "General Order G01-02-07 Organization and Functions of the Bureau of Technical Services," December 2017, accessed November 14, 2019, http://directives.chicagopolice.org/directives/data/a7a57b9b-15632909-98a15-6329-2fd8a504c5b4361a.html?hl=true.

OIG FILE #18-0148
REVIEW OF CPD'S MANAGEMENT AND PRODUCTION OF RECORDS                    JUNE 10, 2020

| | |
|---|---|
| | Order states "when subpoenaed by the defense, officers will NOT provide the defense with any reports or records."[52] (Emphasis in original.) |
| General Order G01-02-01 | G01-02-01, issued on May 10, 2018, states the Office of the General Council's Legal Affairs Section is responsible for responding to subpoenas. [53] |
| Special Order S08-04 | As of June 20, 2019, Special Order S08-04 added unit-level guidance for the processing of subpoenas. The responsibilities are outlined as follows:<br>• Information Services Division will provide units with devoted email accounts to receive subpoenas.<br>• The Records Division will administer GovQA at the unit level and provide training to designated unit members.<br>• Unit Commanding Officers will designate a unit member to monitor subpoena requests, locate corresponding records, and deliver them to the Records Division.[54] |
| Resources CPD-11.717 | The associated resource for CPD's Retention Schedule, issued October 31, 2019, states that the originating CPD unit will maintain its own records. The units may transfer records to the Records Division if records have long retention periods and the originating CPD unit has exceeded its physical storage space.[55] |
| Special Order S09-03-01 | S09-03-01, issued April 6, 2004, delineates where certain CPD records are to be stored. If field-generated reports such as case, supplementary, and traffic crash reports are older than the immediate previous year, but not older than eight years old, they are stored in the Records Storage Center, located at CPD |

---

[52] City of Chicago, Chicago Police Department, "Special Order S08-02 Court Appearance, Notification, and Attendance Responsibilities," January 2019, accessed November 14, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12936eaa-d1812-9373-348ca54934fd782b.html?hl=true.

[53] City of Chicago, Chicago Police Department, "General Order G01-02-01 Organization and Functions of the Office of the Superintendent," May 2018, accessed November 14, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-1291da66-88512-91e5-ccaba9fe9937c542.html?hl=true.

[54] City of Chicago, Chicago Police Department, "Special Order S08-04 Disseminating Information in Civil or Criminal Legal Actions and in Civil Suits Against Department Members," June 2019, accessed November 14, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12b3f6c9-62812-b409-be04b4ffb3292ea5.html?hl=true.

[55] City of Chicago, Chicago Police Department, "CPD-11.717 Forms Retention Schedule," October 31, 2019, accessed November 14, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-12d716c6-c3512-d716-c93ba132012a0a14.html?hl=true.

OIG FILE #18-0148
REVIEW OF CPD'S MANAGEMENT AND PRODUCTION OF RECORDS                    JUNE 10, 2020

| CPD Form | Relevant Information |
|---|---|
| | Headquarters. CPD's off-site Records Warehouse stores paper records with a retention period of six years or longer.[56] |
| CPD-12.145 | The Subpoena Request Guidelines outline for litigants how they should submit subpoenas, how the Subpoena Unit will fulfill and respond to subpoenas, and how litigants should follow-up regarding outstanding requests.[57] |

Source: CPD Directives.

---

[56] City of Chicago, Chicago Police Department, "Special Order S09-03-01 Records Management," April 2004, accessed November 14, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a81847-be112-a818-a1162d94a19017c6.html?hl=true.
[57] Subpoena Unit leadership could not answer OIG's questions regarding form CPD 12.145, and OIG was unable to find a directive providing CPD members guidance on the use of the form. OIG therefore was unable to determine specifically how CPD uses the form. City of Chicago, Chicago Police Department, "Subpoena Request Guidelines," June 2014, accessed November 14, 2019, https://home.chicagopolice.org/wp-content/uploads/2014/12/Subpoena-Request-Guidelines.pdf.

# III.  OBJECTIVES, SCOPE, AND METHODOLOGY

## A.    OBJECTIVES

The objectives of the review were to determine how CPD identifies and produces records for criminal prosecution and civil litigation arising out of law enforcement activities. OIG sought to understand stakeholder experiences when attempting to retrieve or use records from CPD. OIG also tried to identify and assess risks associated with CPD's production processes.

## B.    SCOPE

The scope of this review includes how CPD identifies records responsive to subpoenas and records requests; how those records are produced to litigants; and, the underlying records management systems that affect the identification and production of records. From June 2018 through November 2019, OIG met and communicated with various CPD members and stakeholders to collect information.

Furthermore, included in this report is a review of Subpoena Log entries from August 1, 2018, through August 31, 2018, and a review of GovQA entries from June 1, 2019, through August 31, 2019.

Through stakeholder interviews, OIG determined a need for transparency as it pertains to CPD records and records management. Appendix A includes a demonstrative list of CPD records which OIG determined to be potentially relevant to criminal prosecution or civil litigation arising out of law enforcement activities; the Appendix is intended to demonstrate the breadth of the potential universe of CPD records related to a criminal case, and significant potential for the existence of records which fall outside of litigants' knowledge and specific requests. For the purposes of this demonstrative exercise, OIG only reviewed records present in CPD's Retention Schedule.

This review does not address CPD's systems and processes for creating records, supervisory review of drafts, or information security procedures.

## C.    METHODOLOGY

To determine how CPD identifies and produces responsive records, and to examine risks associated with these practices and processes, OIG interviewed 19 CPD members from the following:

- Office of the Superintendent
  - Office of Legal Affairs

- Bureau of Technical Services
  - Records Division
  - Information Services Division
- Bureau of Detectives
  - Areas North, Central, and South
- Bureau of Organized Crime
- Bureau of Patrol
  - Districts 007, 008, and 011
  - Areas North, Central, and South

To gather stakeholder perspectives on CPD's ability to identify and produce records, OIG interviewed 20 individuals and members of external organizations including:

- Circuit Court of Cook County judges (Juvenile Justice)
- Cook County State's Attorney's Office prosecutors
- United States Attorney's Office prosecutors
- Cook County Public Defender's Office defense attorneys
- Private attorneys

OIG collected stakeholders' accounts of their experiences with CPD's production processes. Stakeholders were identified based on their experience with obtaining, using, and relying on CPD records as evidence in litigation.

To create Appendix A, OIG attorneys reviewed records listed in CPD's April 12, 2019 Retention Schedule to determine which of those records were potentially relevant to criminal prosecution or civil litigation arising out of law enforcement activities.[58] If determined to be potentially relevant, records appear in Appendix A along with a hyperlink to a blank copy of that record; as of March 9, 2019, CPD has made some but not all of these forms publicly available.

To complete its analysis of the Subpoena Unit's attempts to retrieve records from other CPD units, OIG retrieved GovQA and Subpoena Log entries and reviewed the number of times a subpoena was forwarded to CPD units.

## D.    STANDARDS

OIG conducted this review in accordance with the Quality Standards for Inspections, Evaluations, and Reviews by Offices of Inspector General found in the Association of Inspectors General's *Principles and Standards for Offices of Inspector General* (i.e., "The Green Book").

---

[58] City of Chicago, Chicago Police Department, "CPD-11.717 Forms Retention Schedule," March 8, 2019, accessed April 10, 2019.

## E.    AUTHORITY AND ROLE

The authority to perform this inquiry is established in the City of Chicago Municipal Code § § 2-56-030 and -230, which confer on OIG the power and duty to review the programs of City government in order to identify any inefficiencies, waste, and potential for misconduct, to promote economy, efficiency, effectiveness, and integrity in the administration of City programs and operations, and, specifically, to review and the operations of CPD and Chicago's police accountability agencies. The role of OIG is to review City operations and make recommendations for improvement. City management is responsible for establishing and maintaining processes to ensure that City programs operate economically, efficiently, effectively, and with integrity.

# IV.  FINDING AND RECOMMENDATIONS



**FINDING: CPD CANNOT ENSURE THAT IT IDENTIFIES AND PRODUCES ALL RELEVANT RECORDS IN ITS POSSESSION AS REQUIRED.**

CPD's current processes render the Department unable to ensure that it is meeting its constitutional and legal obligations. There have been various public examples of the failure to meet these obligations, with the impacts of these failures being felt by individuals, prosecutors, defense and civil attorneys, and the City itself. Most pressing is the risk that the constitutional rights of individuals are violated through denials of due process, defective trials, and faulty litigative outcomes including wrongful convictions. Additionally, repeated failures to comply with disclosure obligations leave the City at significant risk for adverse civil litigation outcomes, including costly sanctions, settlements, and judgments.

As a result of a lengthy production process, cases may be frequently delayed while litigants await CPD records. These delays have the potential to fundamentally undermine the overall fairness of the justice system. While awaiting trial, criminal defendants are often under some form of pretrial supervision (e.g., in custody, on bail, subject to electronic home monitoring, etc.). Criminal defendants are entitled to swift and fair resolution of their cases,[59] yet pretrial supervision represents a limitation of liberty interests before any finding of guilt; if litigants were in possession of more complete information earlier in the course of a case, they could make more timely and better informed decisions about the viability of charges, the merit of plea offers, and the risks of trial.

CPD's inefficient and ultimately defective production processes, more generally, threaten the quality of administered criminal justice. Stakeholders expressed frustration over the amount of time they needed to devote to discovery and follow up with CPD about pending requests, instead of working on substantive legal issues and managing the case itself. Delayed trial commencement can negatively impact the prosecution and/or defense. For example, witnesses necessary to either side may tire of appearing in court to testify, only to have the court date delayed multiple times due to incomplete records production.  Moreover, timeframes aside, stakeholders lack critical confidence that CPD can be relied upon to identify and produce all appropriate records.

---

[59] 725 ILCS 5/103-5.

There is also a considerable and unnecessary expenditure of resources inherent to CPD's current production processes. CPD members are frequently notified to appear in court or to meet with prosecutors to determine whether the Department has produced relevant records. According to stakeholders, although these meetings are currently necessary to assist in producing records, they take officers and detectives away from their regular law enforcement-related duties and potentially entitle them to overtime pay.

While CPD's implementation and use of GovQA to improve production-related tracking and communications is commendable, the improved tracking of subpoena responses does not result in improved quality or completeness of subpoena responses; that is, CPD's efforts to improve production-related tracking and communication does not address its inability to ensure that it is identifying all relevant records so that they may be produced.

## A.    RISKS TO CPD'S ABILITY TO ENSURE THAT IT IDENTIFIES AND PRODUCES ALL APPROPRIATE RECORDS

### 1.   IDENTIFICATION OF RECORDS

As noted by Records Division and Subpoena Unit leadership, CPD is unable to ensure that all records responsive to a request or subpoena are produced because the Department has no means to effectively identify which records exist for any specific investigation or case; the Department cannot produce records which it fails to identify. Requesting parties, who are themselves unable to know what records might exist, submit most subpoenas with broad language (i.e., seeking "any and all" records relevant to an investigation or case). CPD estimates that 80% to 90% of subpoenas it receives for criminal prosecutions include broad requests. Additionally, for civil litigation, OLA requires DOL to use detailed language in records requests despite not providing DOL a means to identify what records exist. Since CPD does not provide litigants the means to delineate the potential universe of records, litigants cannot determine what relevant records are in CPD's possession in order to request them specifically.

When attempting to identify electronic records responsive to broad subpoenas, Subpoena Unit personnel do not conduct thorough searches to ensure all relevant electronic records are identified and produced to litigants. For example, Subpoena Unit personnel search CLEAR to identify responsive electronic records. CLEAR has 93 applications and does not have a "search all" function to search every application. In the absence of a "search all" function, the Subpoena Unit's searches for electronic records are limited to records each member presumes to exist based on the expectation that similar cases have similar records (e.g., a similar set of records will exist for all burglary investigations). Subpoena Unit personnel believe that they know

where to look based on prior experience, and do not search through all 93 applications. Investigations of similar cases will not always result in the creation of the same universe of records; therefore, these limited searches may not be sufficient to retrieve all responsive records, consequently providing no means to ensure that CPD is meeting its constitutional and legal obligations. One Subpoena Unit member stated that when they received a broadly worded subpoena from a private attorney, they would attempt to contact the requesting party for clarification on the records sought. However, they did not attempt to do the same for subpoenas submitted by prosecutors.

The Subpoena Unit's processes for identifying paper records raise several concerns that impact its ability to produce all responsive paper records. Subpoena Unit personnel stated that they do not attempt to identify paper records when receiving broadly worded subpoenas. According to Subpoena Unit leadership, litigants are content with only receiving electronic records in response to subpoenas with broad language. As was evident from OIG's review of 15,252 GovQA entries between June 2019 and August 2019, 74% of subpoenas received by the Subpoena Unit were not forwarded to any other CPD unit for the retrieval of paper records, 21% were forwarded to one unit, 3% were forwarded to two units, and 2% were forwarded to three or more units (See Figure 3).[60] Among the August 2018 subpoena entries examined by OIG, 98 were related to homicide investigations; only 25 (25.5%) of those were forwarded to CPD's Bureau of Detective to retrieve corresponding investigative files.[61]

---

[60] OIG could not determine the number of units these subpoenas should have been forwarded to; however, when considering that 80% to 90% of subpoenas contain broad language, the forwarding rates found on GovQA raise concerns about the Subpoena Unit's attempts to identify all relevant paper records.

[61] Since CPD's automated systems do not contain all records created during an investigation, such as General Progress Reports, OIG would expect all subpoenas to be forwarded to detective Areas for the retrieval of the full investigative file.

OIG FILE #18-0148
REVIEW OF CPD'S MANAGEMENT AND PRODUCTION OF RECORDS                  JUNE 10, 2020

## FIGURE 3: NUMBER OF UNITS SUBPOENAS WERE FORWARDED TO BY MONTH



Source: GovQA data.

As described above, the Subpoena Unit and OLA do not have the means to determine which paper records may exist within CPD's units, even when those records are specifically requested (e.g., there is no way to determine how many photographs exist for an investigation, even if a requesting party asks specifically for them). Both the Subpoena Unit and OLA rely on assigned personnel within units to identify and produce records. However, many unit personnel with these responsibilities highlighted that they themselves are unable to determine which records exist within their own units, citing a lack of access to all responsive records and inconsistent communication with other Department members to better ensure all responsive records are produced. Additionally, the Subpoena Unit and OLA have limited information about how these units manage their records. This further hinders CPD's ability to ensure that all unit records are identified and produced.

Within other CPD units, members also described varying practices that impact the units' ability to ensure that all responsive records are identified. For example, coming out of the 2020 budget process, CPD's Bureau of Detectives will be divided into five geographically based Areas. Historically, Bureau of Detective Areas have been responsible for managing their own investigative records. Administrative personnel, including some administrative detectives, within these Areas are responsible for collecting approved investigative records from detectives and compiling them into an investigative file.[62] When receiving a production request for an investigatory file, these members locate the file and forward a copy of it to the requesting unit (i.e., the Subpoena Unit or OLA).

However, the procedures described by administrative personnel to determine whether an investigative file is complete vary, are often idiosyncratic and *ad hoc*, and generally are insufficient to ensure completeness (i.e., that all relevant records are

---

[62] The administrative positions were filled by both sworn members and civilian members.

identified and included in the case file).[63] One administrative member stated that they would attempt to communicate with detectives directly, but they were often unsuccessful in doing so; the member believed this may have been due to detectives' workload. Another administrative member stated that they do not have time to contact detectives. To determine if an investigative file was complete, one administrative member stated that they would assess a file's physical thickness. If a file was thin, the member searched CHRIS to find any missing records.[64] Not only is the physical heft of a file a subjective and inadequate measure of its completeness, but also, records missing from a slender file may not necessarily be stored within CHRIS. Some CPD records are paper records and the processes described by the administrative members were insufficient to ensure that these records were being identified and produced. In contrast to Subpoena Unit leadership's assessment of their contentment, many stakeholders expressed frustration when discussing incomplete investigative files, for example, those missing General Progress Reports.[65] Additionally, in 2012 when CPD's Bureau of Detectives was reorganized from five Areas to three, administrative personnel were not provided guidance on how to manage and produce old Area records. Various personnel responsible for these tasks developed their own processes for managing and consolidating these records and, as of May 2019, are still processing them to be sent to the Records Warehouse for permanent storage.

## 2. PRODUCTION PROCESSES

In reviewing CPD's production processes, OIG encountered inconsistent and idiosyncratic individual practices which fundamentally compromise CPD's ability to reliably meet its constitutional and legal obligations. CPD lacks standard, consistent, management-driven practices to ensure all responsive records are produced. Individual members of the Subpoena Unit process subpoenas in different ways; therefore, the competence and completeness of CPD's response to a subpoena or request might depend upon which individual staff member happens to handle it. Some Subpoena Unit members told OIG that, prior to the implementation of GovQA, they would track what records they produced while other members stated that they did not. Currently, the Subpoena Unit uses GovQA to track what is produced in

---

[63] Investigative files may be incomplete for various reasons; including, the records are in the process of being review by supervisory personnel, or detectives have not finalized relevant reports thus they have not been reviewed by supervisors and filed in the investigatory file.

[64] Some records, including Supplementary Reports, are stored within the CHRIS system and on paper in the Investigatory File.

[65] General Progress Reports are designed to standardize the recording of handwritten notes and memoranda including witness or suspect Interviews, on-scene canvasses, written inter-watch communications that are investigative and not administrative in nature, and any other written notes generated during the course of an investigation.

response to a subpoena, but OLA does not use GovQA to track its productions for civil litigation; instead, OLA paralegals track productions in paper case files.

Most stakeholders told OIG that they would send subpoenas and production requests directly to CPD units because they could not rely on the Subpoena Unit to produce records. CPD has the expectation that its units would forward the production request to the Subpoena Unit for tracking and processing. However, some units told OIG that they would directly produce records to litigants when receiving subpoenas, rather than forwarding to the Subpoena Unit. Additionally, members do not consistently track the records they are producing to OLA, the Subpoena Unit, or litigants. While some members may document which records they produce, others do not. Members who do track their production of records commonly do so of their own accord without management-driven guidance from the Department. CPD's current system for tracking production of records, which relies on GovQA, does not capture the production of materials directly to litigants from units other than the Subpoena Unit.

Additionally, CPD does not track the production of records by detectives and officers when they are notified to appear in court or meet with a prosecutor. When CPD members are notified to meet with prosecutors for the purpose of producing their investigative records, notified members may also be asked to review records previously produced by CPD to help ensure that prosecutors have all relevant records to a case. However, even the primary officer or detective on a case may not be well-positioned to evaluate a prosecutor's case file for completeness, as these members would not always be aware of the entire universe of records in CPD's possession, nor would they have access to all CPD records (e.g., an assigned detective may not be aware of, or familiar with, all records created in the course of the arrest and booking of a specific individual). Some CPD administrative members expressed a belief that notifying an investigating member to appear in court was a more reliable method for litigants to retrieve CPD records. However, CPD does not have policies in place dictating what records detectives and officers should produce when they are notified, nor do their units or the Subpoena Unit track what they produce; the result is the potential for widely varying practices and gaps among the records that are produced. Without centrally tracking these alternative production processes, CPD cannot ensure that it has produced all records responsive to subpoenas and requests. Additionally, by not tracking these processes, the Subpoena Unit and OLA may engage in duplicative efforts in attempting to produce records that have already been produced.

### 3. LACK OF REVIEW

In addition to the risks discussed above, which impact CPD's ability to produce records in its possession, the fact that CPD regularly produces records without any legal review of either a subpoena or the Department's response presents the risk of

producing irrelevant materials or materials which raise privacy and public safety concerns.. The fact that the Subpoena Unit's processes do not include a legal review as standard practice further raises the concern that even records which will ultimately be produced are not subject to appropriate scrutiny (e.g., to ensure the redaction of a confidential informant's names). While current processes include OLA's review of certain, specified categories of records (e.g., complaints histories, personnel files, and medical files) prior to release, these triggers for review by an attorney are not broad enough to address all potential public safety and privacy-related concerns. For example, CPD told OIG that records which may impact other ongoing investigations should be reviewed by OLA to ensure proper redaction or withholding of sensitive information; however, current production processes are unclear as to how these records would be identified for review, or whose responsibility it would be to raise these concerns to OLA.[66] Without appropriate legal review of records prior to production, CPD may be running afoul of privacy constraints or putting ongoing police investigations at risk.

Furthermore, the Subpoena Unit's processes do not include a thorough review of all identified records to ensure that they do not include information which is, in one way or another, protected from or inappropriate for disclosure. For example, stakeholders expressed frustration and concern over CPD's production of body-worn camera footage which often includes hours of footage that is not relevant to the incident or case at hand. Such footage may contain recorded unrelated conversations, evidence of separate investigations, or otherwise sensitive material. Overly inclusive production may pose risks to CPD for its failure to ensure the appropriate security of information in its possession.

## B.    CPD'S MANAGEMENT OF RECORDS LACKS CONSISTENT AND COMPREHENSIVE GUIDANCE

CPD's lack of Department-wide, comprehensive, top-down guidance on the management of records is an underlying issue that results in inconsistent and inadequate practices for identifying and producing records. Furthermore, CPD's records management practices are siloed among its information systems and physical locations. CPD does not have well understood, enterprise-wide policies and procedures on how to store and produce records, leading to widely varying practices and profoundly inconsistent results. Existing directives risk confusion, for example, regarding the allocation of responsibilities between OLA and the Subpoena Unit.[67] Additionally, the Records Division does not provide guidance to units on how to best

---

[66] OIG asked both OLA and the Records Division but neither unit could provide an answer.
[67] General Order G01-02-07 states that the Records Inquiry Section, which houses the Subpoena Unit, is responsible for processing subpoenas. General Order G01-02-01 states that OLA is responsible for responding to subpoenas.

OIG FILE #18-0148
REVIEW OF CPD'S MANAGEMENT AND PRODUCTION OF RECORDS                    JUNE 10, 2020

store and produce their records. Many units OIG interviewed did not have applicable unit-level policies, resulting in individual members developing their own practices.[68]

CPD does not provide members of the Subpoena Unit, or other unit members who have records production responsibilities, with any specialized training, including any training on the Department's constitutional and legal obligations with respect to the production of records.[69] New Subpoena Unit members, including new commanding officers, shadow the longest-serving member of the Subpoena Unit to understand how to perform their duties. Within other units, members typically learn "on the job," or rely on guidance provided by the member they replaced, if that person is available. The risks of inadequate production processes increase as untrained members develop their own habits and practices or learn those of their similarly untrained predecessors.

The siloed nature of CPD's records management practices jeopardizes the ability of the Subpoena Unit, OLA, and other units to fulfill their production-related obligations. Members of the Subpoena Unit are often unaware how personnel within the various units ensure that all unit records were identified and produced. Additionally, CPD has not audited these processes to ensure that records are being managed and produced adequately.

## C.    STAKEHOLDERS LACK CONFIDENCE IN CPD'S ABILITY TO MEET ITS CONSTITUTIONAL AND LEGAL OBLIGATIONS[70]

Most of the stakeholders OIG interviewed —including prosecutors, defense attorneys, private attorneys, and judges —stated that CPD's practices around the identification and production of records are ineffective and lack clarity. Due to their experiences with CPD's production processes, and the lack of any means to determine the entire universe of records existing for their cases, stakeholders lack confidence in CPD's ability to meet its constitutional and legal obligations (and by direct implication, the stakeholders' resulting inability to reliably meet their own corresponding obligations). Stakeholders request a common set of records which they expect to exist (e.g., arrest reports or case incident reports) and include broader language in their subpoenas to capture any records which potentially exist but of which they are not specifically aware. Stakeholders described the experience of requesting all records related to a

---

[68] The Bureau of Detectives does have some records management related policies; however, these policies do not speak to the production of records.

[69] In June 2019 these members received GovQA training, detailing how unit members should use the system to provide copies of the records for the Subpoena Unit. The training did not cover CPD's obligations and how CPD members should ensure that all responsive records are identified.

[70] In addition to the stakeholders with whom conversations are described herein, OIG sought to interview representatives from the City of Chicago's DOL. The Department declined to participate in those interviews.

case or investigation, receiving a response, and then having to review the produced records for any references to other, undisclosed records. For example, a case incident report may indicate that a certain piece of evidence was recovered, and a requesting party might then (and only then) be alerted to the potential existence of records related to that piece of evidence. Additionally, stakeholders recounted the need to repeatedly send subpoenas in order to retrieve overlooked records.[71]

Despite subpoenaing CPD multiple times, prosecutors often remain uncertain that they have all of CPD's relevant records. In order to address this uncertainty and to comply with their own disclosure obligations, they may notify officers and detectives to appear, to produce records directly and in-person. Prosecutors' concerns about the incompleteness of their files were underscored by a CPD member who told OIG that, when they met with prosecutors, they would find that the case file produced by CPD was often incomplete.

The lack of confidence in CPD's production processes can be exacerbated by situations in which stakeholders are told that certain records do not exist, only to have those records subsequently come to light, sometimes as late as during or even after the conclusion of a trial. When records come to light during a trial, litigants are deprived of opportunities to make timely and well-informed strategic decisions including, for example, whether to take a case to trial or attempt to resolve it by agreement. Furthermore, the discovery of records after litigation has concluded may deprive litigants of just and appropriate results altogether.

Stakeholders expressed frustration with the widely varying period of time it takes CPD to answer requests and subpoenas, ranging from a few months to years. Stakeholders identified the slow production of records as a primary reason for delayed cases and postponed resolutions. Stakeholders generally found it difficult to communicate with CPD on production-related issues due to unresponsiveness and a lack of clarity about whom to communicate with in CPD. Several stakeholders mentioned that the Subpoena Unit instructs stakeholders to send subpoenas directly to CPD units, despite CPD's written policy vesting the Subpoena Unit with responsibility for processing subpoenas.

---

[71] There are occasions in which records are created and approved by supervisors after CPD produces records in response to a subpoena. Since CPD does not produce unapproved records, litigants are expected to subpoena CPD again for these records; however, it is unclear how litigants would gain knowledge of these newly created records.

## RECOMMENDATIONS

To address the risks in CPD's record production and management systems, OIG recommends the following:

1. CPD should undertake a comprehensive staffing and resource analysis to determine the technical resources, workforce size, and personnel capacities that would be required for the Department to meaningfully meet its constitutional and legal obligations, and should provide its analysis to the Superintendent and the Office of the Mayor.

2. CPD should charge a single unit with responsibility for records management across all units and record types (e.g., paper and electronic records). This entity should ensure that CPD's records management system allows for effective identification and production of records across all units and CPD members, including the Subpoena Unit and OLA. The charged unit should provide other Department units with guidelines as to how CPD members should maintain and file records they create to ensure processes are consistent between different members and different units.

3. The responsible unit, with input from other CPD units, should develop policies, procedures, and trainings to ensure the effective identification and production of records across all CPD units; including, but not limited to:

- Developing a single directive outlining the responsibilities of the Subpoena Unit, OLA, and any other relevant CPD members for ensuring that the Department meets its constitutional and legal obligations, along with a clear delineation of responsibilities;

- Ensuring, both by assigning qualified personnel and by providing adequate training, that responsible members are sufficiently aware of CPD's constitutional and legal obligations and the importance of maintaining and producing records in a manner that satisfies those obligations;

- Providing direction to relevant CPD units as to how to identify and produce paper and electronic records in a manner that will satisfy CPD's obligations, and will allow stakeholders to be reasonably confident that they could submit one production request to CPD and receive all relevant and responsive records;

- Ensuring that, in light of the breadth and weight of CPD's constitutional and legal obligations, Subpoena Unit and OLA personnel are adequately trained on CPD's records management practices and the universe of CPD records;

- Given an understanding of legal and constitutional obligations, ensuring that Subpoena Unit members follow consistent procedures when identifying and producing records responsive to subpoenas;

- Ensuring that all records produced to litigants are tracked, including those not produced by the Subpoena Unit;[72] and,
- Providing clear guidelines on the circumstances under which CPD personnel should forward responsive records to OLA for legal review before production, including identifying the person(s) responsible for doing so.

4. CPD should audit and evaluate its production and records management processes to ensure that records are stored, managed, and produced in accordance with forthcoming policies and in a manner that will allow CPD to meet its obligations.

5. CPD should improve its transparency with stakeholders by providing the contact information for relevant personnel that can answer questions about CPD's management and production of records, as well as providing more complete, publicly available information on the totality of records CPD may have in its possession related to an individual, case, investigation, etc.

6. CPD should develop and implement a comprehensive records management system that allows for the automation of all CPD records. If records need to be created on paper, these records should be scanned into the system and rendered searchable for effective and efficient identification and production.

7. Production processes should provide for the management of older records already in CPD's possession. Improvements to how records are created, stored, and indexed in the future may not impact older records, which may themselves be relevant to ongoing criminal prosecutions and civil litigation arising from law enforcement activities for years to come, given the sometimes-lengthy pendency of these proceedings.

8. CPD should develop a "search all" function for CPD's various CLEAR applications and ensure that related identifiers (e.g., Records Division numbers, associated with cases, and Central Booking numbers, associated with arrests) are associated with one another to make it more efficient for Subpoena Unit and OLA members to identify and gather electronic records.

## MANAGEMENT RESPONSE

1. *"Pursuant to its obligations under the consent decree, the Chicago Police Department is currently undergoing a data-driven staffing assessment and analysis to ensure that its resources are properly allocated in order to maintain unity of command and span of control, and place the Department's finite resources in the best position to respond to incidents and prevent crime at police districts throughout Chicago. See State of Illinois v. City of Chicago, 17-cv-6260, P357-368. As*

---

[72] While CPD should centralize its records production processes to ensure that one entity can effectively respond to all subpoenas, OIG acknowledges that detectives and officers may be notified to appear in court to produce records for the foreseeable future.

*part of this Department-wide staffing analysis, the Records Section and Legal Affairs Section is working with the Office of Reform Management to ensure that these units are fully staffed to ensure the Subpoena Unit's and OLA's ability to respond to the approximate 1700 subpoena requests and numerous document production requests CPD receives on average per week. Simultaneously, personnel and resources from CPD's Information Services Division and other administrative positions are being transitioned to the newly created Department of Public Safety Administration. As these initiatives are undertaken, the Legal Affairs Section and Records Division are continuing to work together to keep the appropriate staffing levels for records production processes. The results of any changes to staffing levels will require approval from each unit's respective chain of command all the way up to the Superintendent, and will be completed in consultation with the Department of Law and the public safety leadership at the Mayor's Office."*

2.  *"It is important that CPD maintain a decentralized record management system that affords the individual units the opportunity to exercise their expertise in the subject matter these records span. For example, records compiled and created in open investigations may need to be vetted to determine if production will impact an ongoing investigation in a way that would prevent an arrest or conviction of an offender. Implementation of a central repository for all records and a single unit responsible for these records would result in the loss of expertise necessary for responsible and complete production. While CPD understands this recommendation, it is simply not possible under the Department's current organizational structure, and would require significant restructuring as well as a large increase in personnel for the new record management unit. Additionally, there are legal questions and consequences with record production that require OLA to be involved in the production of documents. Under its current structure OLA does not have the requisite staffing to be responsible for all maintenance and production of records within the Department. It is also important to note that each unit has expertise in the subjects and records it maintains and it is imperative that these units be involved in the production of documents to ensure that all responsive documents have been identified and produced. To this end, over the last year there has been an increased communication between the Subpoena Unit, OLA, and Records Division to refine processes and to create SOPs which define location and production of records.*

    *Despite these limitations, the Office of Legal Affairs will work with Research and Development to determine if any changes to the current order for filling*

*subpoena requests are necessary. Additionally, OLA and R&D will work together to examine whether a general order setting forth in detail how units should maintain and search for responsive records and verify that such a search is complete. This verification can be used to comply with state and federal discovery requirements while simultaneously ensuring that an individual's constitutional rights are being held to the utmost level of importance. Additionally, each Bureau will be tasked with creating an internal SOP outlining how it should search for records in its control and verify production of these records.*

*With respect to the Subpoena Unit, in order to centralize and streamline its response to records production requests, CPD recently established Department-wide procedures through an electronic tracking and records management software system called GovQA. See Special Order S08-04(V), "Disseminating Information in Civil or Criminal Legal Actions and In Civil Suits" (eff. 20 June 2019). At this time, an email was established for each unit in the Department that would allow assigned personnel to track subpoena requests daily from a centralized source in the Department, and ensure that each request and response was electronically tracked and time stamped. As the software launched, the Subpoena Unit conducted a Department-wide training for all assigned personnel and units to understand the new centralized system and related processes. At the training, the Subpoena Unit required each point of contact to develop a standard operating procedure for responding to subpoenas using the GovQA system. See example attached "114correspondence@chicagopolice.org Standard Operating Procedures for Staff Attorneys" (eff. 23 Oct 2019)."[73]*

3. *"As discussed in Item 2, in 2019 the Department acquired and implemented the GovQA software system in order to electronically streamline and track its records production processes. At a Department-wide training to launch the software, the Subpoena Unit tasked each assigned unit at the training with developing standard operating procedures to respond to production requests, whether manually or electronically produced, in order to begin tracking responses for the approximate 1,200 to 1,500 requests the Department receives weekly. In addition, an email was created with the unit number to begin using the GovQA software, and personnel from each unit would be required to track and respond to requests on a daily basis. In the coming months the Office of Legal Affairs will work with the Records Unit to confirm that each responsive unit has created its own standard operating procedure detailing how it receives, searches for and responds with documents.*

---

[73] No such example was attached to CPD's response.

*For example, in October of 2019 the Legal Affairs Section created a standard operating procedure for tracking and submitting requests through GovQA. The assigned email for Legal Affairs (Unit 114) is 114correspondence@chicagopolice.org. Assigned staff attorneys review the email for subpoena requests each day, and forward requests to assigned paralegals when required. A process is laid out to divide the requests equally among paralegals, and each member is identified by name. The SOP contains several steps to ensure the request is properly documented with an associated case number, and that the chain of custody for the record production request is properly accounted for at each step to ensure staff attorney review and compliance with state law and civil procedure. The Legal Affairs Section has provided notice and training to its staff attorneys, administrative staff, and paralegals, and has worked in consultation with each unit member involved in the process to establish proper protocols in order to meet its legal obligations.*

*In 2017, CPD gave direct access of its electronic records to the Department of Law. Additionally, the Office of Legal Affairs meets weekly with the Federal Civil Rights division of DOL and speaks regularly with the Torts, LIIP, Employment Litigation and Labor divisions to ensure that there are no discovery issues and that these divisions have access to any necessary records. Further, these divisions work with the defendant officers to ensure that all of the records relating to an incident have been tendered.*

*The Office of Legal Affairs is staffed with trained Legal Officers who are practicing attorneys trained in federal and state discovery requirements who also have knowledge of the Department as they are all sworn personnel. Four of the six paralegals assigned to OLA are sworn members who are familiar with the records produced by the Department as well as the structure of the Department because of their years in OLA responding to discovery requests as well as their time as police officers in the Department. Notwithstanding these facts, the current leadership of the Office of Legal Affairs has taken steps to meet with the attorneys and paralegals to discuss any discovery issue that has arisen and to inform them of new records created and inventories of records created as a result of certain cases.*

*As CPD continues to implement the GovQA process, it will update and establish similar SOP's across all units assigned. CPD is currently working with Research & Development to formalize a directive on records production in line with the GovQA system, and continues to solicit feedback from subject matter experts in each unit in order to develop a uniform protocol to ensure a timely and thorough response to records requests."*

4.  *"The Auditing Unit has committed to run an audit of CPD's records production processes once CPD's newly developed document tracking systems and standard operating procedures have been implemented. The Auditing Unit has committed to take into account the recommendations encompassed in the OIG's report, as well as past external reviews of CPD's records management systems."*

5.  *"In its revised directive, CPD will publish a publicly available process that sets forth the protocol for production requests through the new GovQA system. In its SOP's, CPD will ensure that individuals responsible for records requests are identified within units. For example, the Legal Affairs Section SOP names the head and contact number of the Subpoena Unit individually in order to call for questions or concerns, as well as the paralegals assigned to specified request categories.*

    *CPD currently has standing and ongoing meetings with leadership from the Cook County State's Attorney's Office, the Public Defender's Office, and Department of Law. At a recent meeting following training and communication issues with the GovQA software for narcotics cases between CCSAO and CPD, the Supervisory ASA commended CPD for resolving the system issue and streamlining the records production process for their prosecutors and administrative support staff. The standing discovery meeting with the Department of Law occurs weekly, and provides a forum for both sides to discuss improvements to production requests and discovery processes. This regular and open communication will continue to help resolve technical or communication problems and improve outcomes for all parties.*

    *In addition, the Office of Legal Affairs has taken steps to ensure that DOL attorneys can directly contact the subject matter experts necessary to ensure complete document production and defense of the case. Previously these requests all came through the Office of Legal Affairs which resulted in a bottle neck of information. The direct access has afforded the Department of Law the opportunity to directly contact relevant members of the department more quickly and efficiently."*

6.  *"CPD has continued to look for opportunities for automation in its records management practices while keeping in mind the financial and manpower limitations of the Department and the City. As recent examples, the City of Chicago began moving towards automated records systems for vehicle parking tickets, which now includes tickets issued by CPD officers. Additionally, CPD's Bureau of Detectives began scanning electronic records of all General Progress Reports. However, CPD questions the feasibility of creating a single*

*source records management system given the many different bureaus and units that develop and maintain records, with complicated and varying legal, confidentiality, and investigatory interests. Given the cost, personnel, and technical considerations involved, CPD cannot commit to establishing a single records management system at this time. However, high priority is being placed on the development of a comprehensive data systems plan in the near future under the consent decree. See State of Illinois v. City of Chicago, 17-cv-6260, P606-609. CPD is hopeful that once this data systems plan is completed an automated comprehensive record management system can be further investigated and implemented if possible."*

7.  *"As mentioned in Item 6, CPD continues to seek opportunities to move paper records to electronic form in order to improve access and tracking of old files. For example, the Bureau of Detectives recently undertook an initiative to scan older investigative files to an electronic format for this exact reason. As another example, the Bureau of Internal Affairs also moved many of its older CR's into an electronic format in order to ensure that the entirety of prior complaints are readily accessible and identifiable for discovery purposes. This process is arduous and expensive, but as files are being produced in older cases an electronic copy of these hard files is being maintained by BIA. As CPD moves forward on its comprehensive data system [sic]."*

8.  *"In coordination with the Information Services Division, CPD is working to develop a "search all" function by Records Division Number ("RD#") across all applications in the CHRIS and CLEAR systems. CPD intends to build this function into its processes to ensure a thorough and complete search for relevant records related to a case or investigation is conducted."*

OIG FILE #18-0148
REVIEW OF CPD'S MANAGEMENT AND PRODUCTION OF RECORDS                    JUNE 10, 2020

# APPENDIX A: OIG-IDENTIFIED RECORDS POTENTIALLY RELATED TO CRIMINAL PROSEUCTION AND CIVIL LITIGATION ARISING OUT OF LAW ENFORCEMENT ACTIVITIES

| Form No. | Form Title / Record[74] |
|----------|------------------------|
| 11.155 | Chicago Police Department Inter-Office |
| 11.178 | Routing Slip |
| 11.377 | Tactical Response Report |
| 11.377-R | Tactical Response Report - Review |
| 11.377-I | Tactical Response Report-Investigation |
| 11.379 | Taser Non-Field Deployment Report |
| 11.380 | General Offense Case Report |
| 11.383 | Victim Information Notice |
| 11.385 | Victim Complainant Signature |
| 11.386 | Police Shooting Checklist |
| 11.387 | First Amendment Investigations Unit Log |
| 11.390 | Police Parole Compliance Missing Log |
| 11.406 | Hospitalization Case Report |
| 11.407 | Missing/Found Person Case Report |
| 11.409 | Recovered Vehicle Supplementary Report |
| 11.411-A | Supplementary Report |
| 11.411-B | Supplementary Report -Bureau of Detectives |
| 11.412 | Vehicle Theft Case Report |
| 11.413 | Vehicle Tow Report |
| 11.414 | Vice Case Report |
| 11.415 | Worthless Document Case Report |
| 11.417 | Case Report Transfer List |
| 11.419 | Miscellaneous Incident Exception Report |
| 11.420 | Arrest Report |
| 11.426 | Search Warrant Log |
| 11.430 | Arrest Information |
| 11.432 | Arrestee Control Sheet |
| 11.433 | Mass Arrest Card |

---

[74] Records found in this appendix were provided to OIG by CPD. Records in the table were selected from CPD's March 8, 2019 retention schedule. Records and other information that may be relevant to criminal and civil litigation may exist outside of the retention schedule; thus, this appendix is not an exhaustive source.

| 11.435 | Specialized Transportation Voucher |
| 11.440 | First Amendment Worksheet |
| 11.441 | Law Enforcement Report of Conviction |
| 11.442 | Request for Non-Suit Personal Service Citation |
| 11.452 | Towed Vehicle Disposition |
| 11.454 | Dying Declaration |
| 11.455 | Supervisor's Management Log |
| 11.457 | Vehicle/Equipment Inspection Report |
| 11.460 | Suspect Person/Suspect Vehicle (card) |
| 11.461 | Information Report |
| 11.463 | Material Submitted for Use in the Daily Bulletin |
| 11.466 | Special Event Evaluation Report First Amendment Information |
| 11.468 | LEGAL NOTICE for City of Chicago Municipal and State Violations Animal Seizure |
| 11.475 | Vehicle Relocation Report |
| 11.476 | Police Notice - Accident |
| 11.478 | Public/Private Parking Complaint |
| 11.479 | Relocated Vehicle Release |
| 11.480 | Required Warnings to be Given Prior to Interrogation |
| 11.483 | Consent to Search |
| 11.490 | Administrative Message |
| 11.491 | Request to Review/Hold Recording Tapes |
| 11.496 | Citation Control Sheet |
| 11.500-A | Personal Property Envelope (Plastic bag) Size 7.5 x 12.5 |
| 11.500-B | Personal Property Envelope (Plastic bag) Size 15 x 22.5 |
| 11.502 | Personal Property Form (yellow - book) |
| 11.505 | Leg Iron Control Sheet |
| 11.509 | Consent To Search Data Sheet |
| 11.511 | Evidence (plastic bag) |
| 11.512 | Deceased Remains Transportation Report |
| 11.516 | Detention Report |
| 11.521 | Report of Strip Search (original) |
| 11.523 | Guidelines for Arrestee Screening and Monitoring |
| 11.524 | Arrestee Medical Clearance Report |
| 11.525 | Inner Evidence Bag |
| 11.551 | Court Complaint Transmittal (pink) (gold) |
| 11.552 | Court Appearance Information |
| 11.554 | Court Notification/Sworn Member |
| 11.560 | Notification of Court Absence |

| 11.564 | Nonconsensual Blood Draw Request |
|---|---|
| 11.573 | Attorney/711 Visitation Notification |
| 11.574 | Domestic Incident Notice (Braille Version) Log |
| 11.575 | Juvenile - Attorney/711 Visitation Notification |
| 11.602 (A) | Time & Attendance Record (Time & Transfer Record) |
| 11.602 (B) | Time & Attendance Record (Time & Transfer Record) |
| 11.602 (S) | Time & Attendance Record (Time & Transfer Record) |
| 11.605 | Attendance & Assignment Record (original) |
| 11.605 | Attendance & Assignment Record (Unit Copy) |
| 11.608 | Overtime/Compensatory Time Report |
| 11.665 | Behavioral Intervention System Counseling Record |
| 11.666 | Counseling Session Report |
| 11.702 | Certifying Statement |
| 11.704 | Inquiry Request Worksheet |
| 11.714-A | Notification to Consular Officers of Arrests or Detentions Mandatory Reporting Country |
| 11.714-B | Notification to Consular Officers of Arrests or Detentions Non-Mandatory Reporting Country |
| 11.719 | City Claims Notification |
| 11.804-C | Major Incident Notification Index |
| 11.805-C | Major Incident Notification Detail |
| 11.807-C | Major Incident Notification Patrol Summary Report |
| 11.812 | Domestic Violence Assessment |
| 11.900 | Photo/Live Lineup Advisory Form |
| 11.910 | Investigatory Stop Report |
| 11.912 | Investigatory Stop Receipt |
| 11.914 | Investigatory Stop Report Deficiency Notification |
| 11.917 | Investigatory Stop Audit Report |
| 11.918 | Investigatory Stop Report - Unit Monthly Audit |
| 12.113 | Intra-Departmental Memo |
| 12.121 | Form Letter To Accompany Subpoena |
| 12.124 | Thirty Day Administrative Duty Assignment For Firearm Discharge Incidents Checklist |
| 12.125 | Cannabis Field Test Affidavit |
| 12.132 | CPD Certification of Record Search |
| 12.133 | Receipt for Original Chicago Police Department Records |
| 12.140 | Gang Audit Questionnaire |
| 12.151 | Notice if Hearing before the Review Board Pursuant to E05-6-01 |
| 12.152 | Review Board Process - Voting Member Determination |
| 12.153 | Review Board Determination Notice |

| 12.154 | Determination in the Appeal of the Review Board Decision |
|---|---|
| 15.520 | Mental Health - Crisis Intervention Report |
| 21.101 | Contact Information Card |
| 21.102 | Juvenile Contact Information Card |
| 21.111 | Open & Vacant Building Checklist |
| 21.116 | Infraction Report |
| 21.130 | Body Worn Camera Video Review Report |
| 21.131 | Body Worn Camera Videos Viewed |
| 21.141-A | Neighborhood Policing Program -Problem Solving Report-Identification |
| 21.141-B | Neighborhood Policing Program - Problem Solving Report - Follow Up |
| 21.141-C | Neighborhood Policing Program - Problem Solving Report - Closure |
| 21.142 | Neighborhood Policing Program - Daily Activity Report |
| 21.200 | Bail Bond Cash Envelope & Receipt |
| 21.204 | Covert Vehicle Log |
| 21.206 | Covert Vehicle Control Sheet |
| 21.235 | Community Concern Sheet |
| 21.243 | X-CAT Field Test Narcotic Kit Log |
| 21.244 | X-CAT Field Test Narcotic Kit List |
| 21.245 | Unit Naloxone Issuance Log |
| 21.246 | Unit Naloxone Returned or Lost Log |
| 21.300 | Daily Mission Record |
| 21.305 | Voluntary Special Employment Supervisor's Field Log |
| 21.309 | Watch Commander's Log - Special Functions Group |
| 21.311 | Illinois Law Enforcement Alarm System Log |
| 21.318 | Officers Daily Activity Log |
| 21.319 | Noise Flash Diversionary Device Control Sheet |
| 21.320 | Sergeants Mission Activity Log |
| 21.324 | SWAT Incident Log |
| 21.328 | B.O.P. Daily Assignment Activity Log |
| 21.331 | Helicopter Radio Assignments and Events |
| 21.332 | Helicopter Secondary Mission Sheet |
| 21.333 | Helicopter Homeland Security Mission Sheet |
| 21.360 | C.T.A. Voluntary Special Employment Program/Daily Assignment Activity Report |
| 21.372 | "Hot Spot" Designation Application |
| 21.373 | Gang/Narcotic-Related Loitering Hot Spot Dispersal Request for Event Number Denial Form |
| 21.418 | Explosive Training Record |

| 21.421 | Dog Bite Incident Report |
|---|---|
| 21.431 | Daily Assignment Record/Mounted Unit |
| 21.438 | Safe Harbor Intervention Patrol (SHIP) |
| 21.444 | Dive Report |
| 21.445 | Dive Log |
| 21.450 | Daily Activity Report- Special Functions Division |
| 21.456 | Boat Accident Investigation Report |
| 21.460 | Daily Watch Assignment Record/ Airport Law Enforcement |
| 21.468 | Chicago Police Marine Unit Emergency Medical Report |
| 21.470 | Canine Field Activity Log |
| 21.471 | Canine Training Log - Explosive |
| 21.474 | Canine Training Log |
| 21.558 | Medical Continuing Education Form |
| 21.559 | Daily Automated External Defibrillator (AED) Inspection Checklist |
| 21.600 | Court Log |
| 21.602 | Court Section Report to Commanding Officer |
| 21.606 | Court Log- Narcotics Court |
| 21.616 | Exceptional Response Plan (ERP) Checklist |
| 21.618 | CPD Member Appearance Report - Grand Jury / Branch 66 |
| 21.636 | Seatbelt Enforcement Zone Activity Report |
| 21.640 | Sobriety Safety Check Point Log |
| 21.641 | Sobriety Safety Check Activity Report |
| 21.642 | Sobriety Safety Check Results Log |
| 21.643 | Site Selection Authorization for Use of Private Property |
| 21.644 | Sobriety Safety Check Pre-Event Notification Form |
| 21.645 | Sobriety Safety Check Post-Event Notification Form |
| 21.646 | Sobriety Safety Check Post-Event Website Posting |
| 21.647 | Sobriety Safety Check Post-Event News Release |
| 21.651 | Watch Complement & Field Assignments Report |
| 21.716 | Trespass Affidavit Program Enrollment Form |
| 21.717 | Trespass Affidavit Program Authorization List |
| 21.718 | Criminal Trespass Affidavit |
| 21.827 | Daily Activity Report - "Students First" Safe Passage Program |
| 21.904 | Weekly Activity Report/District Tactical Teams (unit copy) |
| 21.905 | Domestic Violence Bail Bond Attachment Special Conditions |
| 21.912 | Property Room Log |
| 21.916 | Watch Incident Log |
| 21.919 | Personal Equipment Log |

| 21.931 | District Assignment Schedule-Foot Routes, Furlough & Miscellaneous |
|--------|--------------------------------------------------------------------|
| 21.938 | District School Visitation Report |
| 21.953 | Daily Activity Report /Park District Patrol |
| 21.957 | Fixed Remote Surveillance POD Video Retrieval Request |
| 21.958 | Observation Van Deployment / Video Retrieval Request |
| 21.959 | Observation Van Worksheet Log |
| 21.963 | Informational Checkpoint Incident Report |
| 21.964 | Tour of Duty Report |
| 21.965 | POD Placement Request |
| 21.966 | POD Camera Information |
| 21.967 | Camera POD / Image Retrieval Investigative Report |
| 21.970 | LIDAR Speed Detection Log |
| 21.971 | Arrestee and Property Transport Manifest |
| 21.972 | Arrestee Property Log |
| 21.973 | Murder/Shooting Notification |
| 21.974 | Lockup Facility Weekly Inspection Report |
| 21.975 | Daily Prisoner Log Record |
| 22.101 | Daily Activity Report, Traffic |
| 22.103 | Daily Activity Report, Traffic Enforcement |
| 22.110 | Illinois Traffic Crash Report (File) |
| 22.111 | Driver's Crash Statement (copy) |
| 22.112 | Witness' Crash Statement |
| 22.114 | Additional Witness Information-Personal Service Citation |
| 22.118 | Alcohol/Drug Influence Report |
| 22.121 | DUI Case Management File Folder |
| 22.122 | Driver Information Exchange Card |
| 22.908 | Notification of Rescheduled Traffic Court or Civil Law Case |
| 22.909 | Transmittal Listing/DUI Evidentiary Report |
| 22.918 | Court Notification Log/Absentee & Late Arrivals |
| 22.951 | Department Vehicle Traffic Crash or Damage Report |
| 22.958 | Traffic Pursuit Report |
| 22.959 | Traffic Pursuit Supplemental Report |
| 22.960 | Traffic Pursuit Report Continuation Sheet |
| 23.100 | Vehicle Assignment Log |
| 23.121 | Investigative File Inventory |
| 23.122 | General Progress Report |
| 23.124 | Investigative File Control |
| 23.171 | Social Media Request |

| 23.177 | H/B/T Sniper Program Record |
|--------|------------------------------|
| 23.180 | Felony Minute Sheet |
| 23.181 | Request for Latent Fingerprint Comparison |
| 23.185 | Detective Division CAPS Information Notice |
| 23.186 | Defendant Hold Notification |
| 23.188 | Contact Analysis Report/Detective Division |
| 23.189 | Receipt Advancement of Funds Report |
| 23.190 | Reliability/Advancement of Funds Report |
| 23.191 | Probable Cause Statement & Judicial Determination |
| 23.192 | Detective Division Arrestee Form |
| 23.195 | Evidence Transmittal |
| 23.196 | Request for Evidence from ERPS |
| 23.198 | Polygraph Unit DVD/Video |
| 23.199 | Digital Recording of DVD/Digital Video Tape/Cassette Receipt |
| 23.204 | Consent to Collect Biological Samples for Elimination Purposes |
| 23.205 | Criminal Registration Receipt |
| 23.206 | School/Playground/Daycare Zone Violation Notice |
| 23.210 | Gun Offender Registration Notification - (For External Agency Use) |
| 23.213 | Registration Fee Waiver Application |
| 23.214 | Gun Offender Registration - CPD Notification |
| 23.216 | Chicago Gun Offender Registration |
| 23.217 | Registration as a Person Lacking a Fixed Residence |
| 23.218 | Criminal Registrants Notification of Requirements |
| 23.223 | Sex Offender Community Notification Letter |
| 23.224 | Certified Declaration - Sex Offender |
| 23.225 | Certified Declaration - MVOAY |
| 23.226 | Certified Declaration - Gun Offender |
| 23.227 | Certified Declaration - Arsonist |
| 23.262 | Polygraph Examiner Tracking Sheet |
| 23.263 | Peer Review Polygraph Score Sheet |
| 23.264 | Specific Issue Polygraph Score Sheet |
| 23.270 | Social Media Exploitation (SOMEX) Team Intelligence Report |
| 23.271 | Consent to Assume Online Identity Authorization |
| 23.404 | Sexual Assault Incident Notice |
| 23.406 | Homicide Case Folder |
| 23.407 | Sworn Weapon Discharge Incident Folder |
| 23.410 | Victim Notification of Sexual Assault Evidence |
| 23.411 | Juvenile Felony Investigative Summary Sheet |
| 23.482 | Report of Detective Assignments |

| 23.871 | Daily Arrest Record |
|---|---|
| 23.971 | DOC Analyst Field Data Report |
| 23.988 | Receipt of Allegation |
| 24.110 | Juvenile Minutes Sheet |
| 24.111 | Curfew Violation Report |
| 24.112 | Transmittal/Curfew Violation-School Absentee |
| 24.118 | Child Abuse Hotline Notification |
| 24.136 | Formal Station Adjustment |
| 24.137 | Informal Station Adjustment |
| 24.138 | Risk Assessment |
| 24.144 | Request To Initiate The AMBER Alert Notification Plan |
| 24.147 | Conditions of Station Adjustment Notification and Agreement |
| 24.148 | Notice of Noncompliance with the Conditions of Station Adjustment |
| 24.402 | Community Risk Information Sheet |
| 24.403 | Processing Detective Disclosure Form |
| 24.410 | Parent/Guardian Request For Juvenile Court Referral |
| 24.418 | JISC Overflow Referral Form |
| 24.419 | JISC Arrest Disposition Screening Instrument |
| 24.420 | Condition of Station Adjustment - CTTV Workshop Requirement |
| 24.421 | Condition of Station Adjustment - CTTV Workshop Violation |
| 24.422 | CTTV Workshop Parent/Guardian Notification Call Log |
| 24.423 | CTTV Workshop Participants Roster and Session Log |
| 24.424 | CTTV Workshop Sign-In Sheet |
| 24.458 | CPD Arrest On/Around Chicago Public School Property |
| 24.483 | Juvenile Record Inquiry |
| 24.506 | Missing Persons Daily Telephone Log |
| 24.511 | Immediate Action Investigation/Tender Age Missing |
| 24.518 | Daily Log of Juveniles Taken Into Custody |
| 31.114 | LEADS User Request Form |
| 31.117 | Notice of Non-Eligibility for U Nonimmigrant Status Certification |
| 31.233 | Recovered Firearm Information |
| 31.236 | Repossessed Vehicle Card |
| 31.245 | Notification of Private Tow |
| 31.408 | Application for Authority to Dispose of Local Records |
| 31.409 | Records Disposal Certificate |
| 31.560 | Gun Recovery Information |
| 31.562 | Firearms Registration |
| 31.563 | Affidavit of Employment |

| 31.571 | Bicycle Registration Card |
| 31.579 | Gun Registration Change of Information |
| 31.610 | Firearms Disposition |
| 31.614 | Status of Firearm |
| 31.615 | Criminal Enterprise Database Review & Appeal |
| 31.621 | Firearms Registration Letter |
| 31.660 | Transfer List-Traffic Crash Reports |
| 31.678 | Audit Sheet of Missing Reports |
| 31.707 | Redline Notification |
| 31.714 | Expunged Record (file card) |
| 31.813 | Fingerprint Card - Adult |
| 31.813 | Fingerprint Card - Juvenile |
| 31.814 | Palm print Card |
| 31.853 | Fingerprint Examination Report |
| 31.855 | Latent Print Evidence Envelope |
| 31.856 | Latent Print Examination Report |
| 31.857 | Case Documentation Worksheet |
| 31.858 | AFIS Documentation Worksheet |
| 31.859 | Case Checklist |
| 31.860 | Reviewer Case Checklist |
| 31.904 | Request for Identification Records |
| 31.911 | Request for Multiple Identification Records |
| 31.951 | Request for Identification Photos |
| 32.103 | P.D.T. Service Request |
| 32.604 | Confirmation of Transfer of Sexual Assault Report to Law Enforcement Agency Having Jurisdiction |
| 32.622 | Daily Activity Report-Alternate Response Program Call Back Volume |
| 32.623 | Weekly Summary - Alternate Response Section |
| 33.100 | Request for Analysis/Receipt for Exhibit |
| 33.101 | Evidence Envelope |
| 33.111 | Latent Prints Envelope |
| 33.113 | Major Crime Scene Report |
| 33.117 | Request for Records - Forensic Services Div. |
| 33.119 | Firearms Evidence Label |
| 33.310 | Evidence Label - Large Size |
| 33.310-A | Evidence Label - Small Size |
| 33.316 | Crime Scene Worksheet |
| 33.335 | Narcotic Evidence Log & Transmittal |
| 33.367 | Consent to Collect Biological Samples |

| 33.404 | Firearms Evidence Envelope |
| 33.407 | Pellet Envelope |
| 33.500 | Polygraph Case Review |
| 33.501 | Polygraph Examiner's Worksheet |
| 33.503 | Polygraph Subject's Consent |
| 33.503-A | Polygraph Subject Consent |
| 33.701 | Crime Lab Negative Envelope |
| 33.713 | Request for Evidence Identification Photographs |
| 33.715 | Photo Identification Card |
| 33.716 | Photography Team Activity Report |
| 33.802 | Daily Activity Report-Crime Scene Processing Section |
| 33.807 | Palmprint Elimination Card |
| 33.817 | Notification to Victim - Forensic Services |
| 34.303 | Motor Vehicle Inventory Report |
| 34.312 | Daily Vehicle Activity Report |
| 34.325 | Receipt for Impounded Vehicle (copies 2 & 3) |
| 34.339 | Notification-Stolen Vehicle Recovered Message |
| 34.342 | Request to Impound Vehicle by Police |
| 34.343 | Notice of Intent to Impound Vehicle |
| 34.347 | Vehicle Impoundment/Seizure Report |
| 34.500 | Recovered Property Disposition Tracer |
| 34.502 | Request for Confiscated Property |
| 34.510 | Evidence Tag (red & manila) |
| 34.511-A | Court Order Releasing Property |
| 34.511-B | Court Order/Disposal of Property |
| 34.511-C | Court Order |
| 34.512 | Court Order to Impound Evidence |
| 34.520 | Evidence & Recovered Property Envelope |
| 34.520-A | Evidence & Recovered Property Envelope - Narcotics |
| 34.520-B | Evidence & Recovered Property Envelope - Firearms |
| 34.523 | Property Inventory - File |
| 34.549 | Auction Sales Record |
| 34.553 | Currency Disposition Record/Partial Turnover |
| 34.554 | Property Release Order |
| 34.557 | Property Receipt/A.S.A. or Law Enforcement Agency |
| 34.559-A | Evidence Property Envelope (Plastic bag) Size 7 x 12 |
| 34.559-B | Evidence Property Envelope (Plastic bag) Size 15 x 20 |
| 34.559-C | Evidence Property Envelope (Plastic bag) Size 18 x 36 |
| 34.562 | Evidence and Recovered Property Section (ERPS) Inspection Sheet |

| 34.611 | Vehicle Equipment Issued Log |
|--------|------------------------------|
| 34.612 | Firearms Inventory Control |
| 34.613 | Lockup Keepers Monthly Food Record |
| 34.623 | Equipment & Supply Section Naloxone Issuance Log |
| 34.653 | Bond Money Transmittal Receipt |
| 34.654 | Property Transmittal |
| 34.655 | Latent Fingerprint Lift Transmittal |
| 34.660 | C.P.D. Radio/P.D.T. Repair Request |
| 41.105 | Observation or Surveillance Report |
| 41.111 | Report Control |
| 41.117 | Film/Photo/Video Processing Request |
| 41.124 | Evidence Recovery Log |
| 41.303 | Organized Crime Division Arrestee Form |
| 41.304 | Tactical Plan/Raid Preparation List |
| 41.307 | Social Media Covert Identity Authorization (SMCID) |
| 41.308 | Narcotics Saturation Daily Activity Sheet |
| 41.367 | CD/DVD Envelope |
| 41.506 | Report of Investigation |
| 41.507 | Notification to Assistant State's Attorney Assigned to Central Bond Court |
| 41.551 | Disclaimer of Ownership & Knowledge of Ownership |
| 41.552 | Asset Forfeiture Investigation Report |
| 41.700 | Daily Prisoner Log |
| 41.703 | Search Warrant Data |
| 41.709 | Daily Assignment Status Report |
| 41.714 | Operation Pinpoint Request |
| 41.720 | Currency Inventory Bag (CIB) (Plastic bag) |
| 41.720-A | Currency Inventory Bag (CIB) Receipt (Plastic) |
| 42.501 | Daily Inspection Report |
| 42.503 | Irregularity Report |
| 42.510 | Inspection Report (all copies) |
| 43.100 | Vice Complaint |
| 43.404 | Contact Analysis Report (unit copy) |
| 43.408 | Confidential Informant Agreement |
| 43.409 | Reliability/Advancement of Funds Request |
| 43.411 | Evidence of Purchase/Official Advance Funds |
| 43.412 | Cash Receipt-Withdrawal/Official Advance Funds-Notice of Debit |
| 43.413 | Pre-Recorded Funds |
| 43.415 | B.O.C. Field Assignment Form |

| 43.416 | Search Request |
| 43.420 | Surveillance Report Log |
| 43.423 | Raid Activity Summary |
| 44.101 | Reprimand |
| 44.102 | Suspension Notification |
| 44.103 | Request for Interview/Statement/Report |
| 44.104 | Criminal Rights/Notification of Charges Allegation |
| 44.105 | Administrative Proceeding Rights/Notification of Charges/Allegations |
| 44.106 | Waiver of Counsel/Request to Secure Counsel |
| 44.108 | Investigator's Checklist |
| 44.112 | Summary Report |
| 44.112-A | Summary Report Digest |
| 44.113 | Command Channel Review |
| 44.113-A | Command Channel Review-Sustained Log Number Investigation |
| 44.114 | Request for Time Extension |
| 44.115 | Notification of Charges/Allegations |
| 44.117 | Consent by Patient to Disclosure of Information |
| 44.126 | Sworn Affidavit For Log Number Investigation |
| 44.127 | Sworn Affidavit For Log Number Investigation (Electronically Recorded Statement) |
| 44.128-A | Override Affidavit - Bureau of Internal Affairs |
| 44.128-B | Override Affidavit - Civilian Office of Police Accountability |
| 44.130 | Administrative Alcohol/Drug Influence Report |
| 44.135 | B.I.A. General Progress Report |
| 44.163 | Evidence Collection Bag |
| 44.164 | B.I.A. Request for Photographs |
| 44.166 | B.I.A. Reliability/Advancement of Funds Report |
| 44.200 | Complaint Register |
| 44.207 | Classification Notification |
| 44.211 | Confirmation of Telephone Notification-BIA |
| 44.212 | Specifications |
| 44.213 | Log No. Case Summary |
| 44.217 | Notification Re: Automated Complaint |
| 44.222 | Waiver of /Request for Police Board Review of Suspension |
| 44.223 | Investigator Unable To Contact Reporting Party/Victim/Witness |
| 44.225 | Request for Disposition Letter to Reporting Party |
| 44.246 | Request for Review of Discipline (Reprimands and Suspensions from One (1) to (10) Ten Days) |
| 44.249 | Traffic Review Board Summary of Findings |

| | |
|---|---|
| 44.250 | Reporting Party/Victim/Witness Statement |
| 44.251-A | Request for Review of Discipline (For Discipline of Eleven (11) to Thirty (30) Days |
| 44.251-B | Request for Review of Discipline (For Discipline of Thirty-One (31) to (365) Days |
| 44.252 | Notice of Alcohol and Drug Testing Following a Firearms Discharge Incident |
| 44.255 | Mediation Agreement |
| 44.256 | Pre-Disciplinary Hearing |
| 44.257 | Pre-Disciplinary Meeting - Notice to Union (AFSCME) |
| 44.258 | Notification of Log Investigation |
| 44.259 | Request for Disciplinary Record |
| 44.260 | Consent to Audio Record Statement - Non-Department Members |
| 44.261 | Receipt of Formal Statement - Department Members |
| 44.262 | Neighbor Interview Canvass Report |
| 44.263 | Notice of Recommendation for Mediation Review |
| 44.264 | BIA Photo Line-Up Advisory Form - (Administrative) |
| 44.265 | BIA Evidence Checklist |
| 44.266 | BIA Investigative File Control |
| 44.267 | Consent to Audio Record Statement - Civilian Department Member |
| 44.279 | Bureau of Internal Affairs Confidentiality Policy |
| 44.300 | Notification of Duty Restrictions (Civilian Members) |
| 44.301 | Notification of Duty Restrictions (Sworn Members) |
| 44.302 | Request for Issuance of Temporary ID Card-BIA |
| 44.304 | Statement of Complainant to Terminate Complaint |
| 44.306 | Release of Duty Restrictions (Sworn Members) |
| 44.307 | Release of Duty Restrictions (Civilian Members) |
| 44.308 | Notification of Duty Restrictions (Recruit) |
| 44.402 | Request to Bypass Command Channel Review |
| 44.500 | Notification of Complaint Review Panel Hearing (all copies) |
| 44.501 | Notification Relative to Police Board Hearing |
| 44.504 | Police Board Case-Progress Record |
| 44.508 | Log Number Review and Return |
| 44.509 | Notification -Advocate Section |
| 44.512 | Police Board Hearing |
| 61.230 | Cost Recovery Incident Form |
| 61.231 | Cost Recovery Incident Form - Detective Division |
| 61.314-A-D | Request for Reimbursement |
| 61.416 | Election/Rejection of Options to Suspension |
| 62.109 | Rules and Regulations Affidavit |

| 62.138 | Letter of Recommendation |
| 62.142 | Notification of Duty Restrictions Per Director, Human Resources Division - FOID Card |
| 62.152 | Personal History Questionnaire -Sworn (PHQ) |
| 62.216 | Non-Disciplinary Intervention Report |
| 62.217 | Individualized Performance Plan |
| 62.357 | Performance Evaluation - Sworn Supervisors |
| 62.358 | Performance Improvement Plan (PIP) - Sworn Supervisors |
| 62.366 | Personnel Concerns Progress Report |
| 62.369 | Medical or Complaint Log Investigation Conflict Certification |
| 62.441 | Drug Test Specimen Affidavit |
| 62.442 | Hair/Nail Sample Test Affidavit |
| 62.461 | Mandatory Physical and/or Psychological Examination Notification |
| 62.463 | Random Drug & Alcohol Testing Notification |
| 62.467 | Civilian Analysis Specimen Affidavit |
| 63.328 | Recruit Firearms Shooting Record |
| 63.340 | Ammunition Report |
| 63.344 | Firearm Loan Receipt |
| 63.345 | Training Deficiency Notification |
| 63.346 | Firearms Training Unit Attendance Sheet |
| 65.118 | E-Mail Compliance Statement |
| 65.119 | E-Mail Search Request |
| 65.224 | Digitally Recorded Data Viewing/Hold/Duplication Request |
| ACC-3230-34 | Animal Inventory (pink) |
| CCM602/08/09 | Bail Bond Receipt Book |
| NONE | Body Worn Camera Video[75] |
| NONE | C.T.A. Surveillance Card |
| NONE | Citation, Personal Service (Dept. record copies) |
| NONE | Commanding Officer's Book[76] |
| NONE | Complaint Register (C.R.) File |
| NONE | Complaints, Mayor's Office of Inquiry & Information[77] |
| NONE | DUI Case Files |
| NONE | Grievance Files (Original) |
| NONE | In Car Camera Video[78] |
| NONE | Inspection Log of Persons in Custody |

---

[75] Body Worn Camera Video was not hyperlinked as no template version of video exists.

[76] Commanding Officer's Book was not hyperlinked; it is a book with blank pages.

[77] CPD informed OIG that this record is no longer in use.

[78] In Car Camera Video was not hyperlinked as no template version of video exists.

| NONE | Juvenile Jacket |
|------|------|
| NONE | Mayor's Office of Inquiry & Information Complaints[79] |
| NONE | Motor Vehicle Inventory File |
| NONE | Personal Service Citation (Dept. copy) |
| NONE | Personnel Jacket |
| NONE | Personnel Orders (original) |
| NONE | Search Warrant File |
| NONE | Summary Punishment File |
| NONE | Traffic Citation Book Receipt |
| NONE | Unit Personnel Jacket[80] |
| NONE | Urine Drug Test File |
| PER-95 | Performance Evaluation |
| PER-96 | Performance Evaluation-Supervisory |
| Varies | Case Report File[81] |

---

[79] CPD informed OIG that this record is no longer in use.
[80] A template was not hyperlinked as contents of files vary.
[81] A template was not hyperlinked as contents of files vary depending on the case type.

# APPENDIX B: CPD'S RESPONSE



| Lori E. Lightfoot | Department of Police · City of Chicago | Charlie Beck |
|---|---|---|
| Mayor | 3510 S. Michigan Avenue · Chicago, Illinois 60653 | Interim Superintendent of Police |

February 14, 2020

**VIA ELECTRONIC MAIL**
Mr. Joseph M. Ferguson
Inspector General
City of Chicago Office of Inspector General
740 N. Sedgwick, Suite 200
Chicago, Illinois 60654
jferguson@igchicago.org

> **Re:**   ***CPD's Response to OIG Review of the Chicago Police Department's Management and Production of Records***

Dear Inspector General Ferguson:

Please see below the Chicago Police Department's ("CPD") response to the City of Chicago Office of Inspector General's ("OIG") *Review of the Chicago Police Department's Management and Production of Records.* CPD incorporates herein its individual responses on the "Management Response Form" provided by the OIG's auditing team.

As a preliminary matter, it is imperative to emphasize that the Chicago Police Department agrees that protecting individual legal and constitutional rights in both criminal and civil litigation is of the utmost importance. Additionally, the Department seeks to operate in a fully open and transparent manner. These values have been at the root of the numerous changes and improvement CPD has made over the last few years to processes related to the Department's record management and production systems.

That said, the OIG's audit and analysis of CPD's records management and production does not adequately reflect the current discovery and records production processes within the Department. This is due in large part to OIG's initiation of the audit of CPD's records management systems before the electronic systems and improvements were implemented, and the decision of the City of Chicago Department of Law ("DOL") not to participate in the audit and divulge processes to the OIG that are protected under attorney work product privilege. The OIG also did not interview DOL's retained outside counsel that represent the City of Chicago and CPD in certain civil matters. As it pertains to civil litigation, in its "stakeholder" interviews, the OIG's opinions from external partners were based solely upon "private attorneys" who represent the plaintiffs that sue the City of Chicago and Chicago Police Department, and have a fundamental self-interest in creating a negative perception of CPD's discovery processes. Finally, in framing the issue, the OIG cites to a limited number of instances, some quite old, in which the production of records was delayed or records were not produced during litigation, without context for the tens of thousands of cases in which CPD has been involved and completed discovery properly.

---

**Emergency and TTY:** 9-1-1 · **Non Emergency and TTY:** (within city limits) 3-1-1 · **Non Emergency and TTY:** (outside city limits) (312) 746-6000
**E-mail:** police@cityofchicago.org  · **Website:** www.cityofchicago.org/police

PAGE 54

Indeed, in relying on the instances cited in the report, the OIG fails to take into account the volume of document requests in criminal and civil cases that CPD handles. CPD responds to approximately 1,700 subpoenas and document production requests on average per week, or over 88,000 on average per year. When mistakes in particular cases were made, the OIG's report fails to account for the significant remedial measures already taken following those instances to prevent those discovery issues from reoccurring. CPD flatly rejects the OIG's conclusion – reached from citing a handful of discovery sanctions – that CPD lacks the capability to respond thoroughly and completely to meet its constitutional and legal obligations in the criminal and civil matters to which the Department is a party.

In fact, each case cited by the OIG has led to a material improvement in CPD's document production and management systems. Following the discovery sanctions leveled in these cases, CPD has taken remedial measures in coordination with DOL to produce complete responsive records. For example, the report cites to the *Fields* case as an example of documents not produced in a criminal trial which were later produced in the civil trial. It should first be noted that while it is inexcusable that the General Progress Reports (GPRs) were not produced, the failure to produce these records occurred over 35 years ago. In fact, the review of the files referenced in the OIG Report occurred years before the 2016 article that the OIG cites to as support for the order to review files. The investigative files reviewed by Plaintiffs' counsel in the Fields case have since been reviewed by DOL, moved to CPD Headquarters, audited by the Bureau of Detectives, and converted to electronic files (while maintaining the original files) in an effort to ensure that these investigative files are readily produced in response to discovery requests and subpoenas. Furthermore, as a result of the CR that was not located in the *Cazares* case in 2017, CPD created an overarching search tool that allows the Bureau of Internal Affairs the ability to search multiple databases containing disciplinary history in a single search. Additionally, CPD obtained the full version of the Warehouse Inventory List previously maintained by Corporation Counsel and its outside counsel. Access to this full list has allowed the Bureau of Internal Affairs an additional tool to ensure a fulsome search of all disciplinary histories of officers. Similarly, in response to the Motion in *Young*, CPD and DOL worked to create a comprehensive list of potentially relevant documents in all officer-involved shooting investigations, and trained its attorneys and paralegals to work through this checklist to ensure complete records production for every OIS investigation. Significantly, after the law firm of Winston & Strawn issued its external review of DOL and CPD's discovery processes, both instituted changes recommended by the firm's report including providing DOL with direct access to CPD's electronic databases to pull relevant documents directly, and establishing an open line of communication in standing meetings between both partners to discuss individual cases and improve processes.

CPD's Office of Legal Affairs has coordinated with its counterparts at DOL to ensure that attorneys and staff are fully aware of the types of records and official forms CPD maintains. Additionally, DOL receives monthly updates of CPD orders and forms created by CPD's Research & Development Unit. CPD's Office of Legal Affairs further participates in standing weekly meetings with DOL leadership to update one another on pending litigation, ensure discovery requests are complete, and continue to refine its processes. Similarly, CPD maintains ongoing meetings with leadership at the Cook County State's Attorney's Office to discuss records disclosure and ensure discovery obligations are met between both agencies, particularly in light of the adoption of its new electronic subpoena and discovery tracking systems.

In order to adequately manage the huge volume of requests it receives and modernize its systems, last year the Chicago Police Department's Records Division adopted an electronic document request and tracking system to account for each request and ensure a timely and thorough discovery response in every criminal case to which CPD receives a subpoena. During this time, CPD's Records Division also worked to establish standard

2 | P a g e

operating procedures within its Subpoena Unit to address the issues of officers handling responses in different ways. Recognizing the complexity and varying duties and investigatory records within each unit throughout the Department, CPD is currently working to establish an order setting forth Department-wide standard operating procedures for records production and management. CPD will take the recommendations made by OIG's auditing team when drafting and implementing this order. In the coming months the Office of Legal Affairs hopes to introduce a similar electronic request and tracking system that will allow records to be produced by the units who maintain them while being tracked by the trained paralegals in OLA to ensure the appropriate units have responded and the documents have been received by DOL.

As referenced in greater detail in its "Management Response Form," CPD has either already completed or taken substantial steps to address each of the recommendations provided by the OIG. In summary, the Department now follows an electronically tracked and time stamped records production and subpoena response process, with standard operating procedures implemented at the Subpoena Unit and Office of Legal Affairs. CPD will continue to develop SOP's applicable to each unit and division throughout the Department to streamline the records production process based upon the individual unit involved in any litigation. CPD acknowledges that there have been mistakes made in the past and there is, of course, room for additional improvement as the Department moves forward. CPD takes its responsibility to quickly and thoroughly respond to document requests and subpoenas very seriously and holds the constitutional protections afforded to each person with the utmost regard. CPD continues to work to keep all of its records electronically maintained and accessible upon request, including within the Bureau of Detectives and Bureau of Internal Affairs. Given the transformational reorganization and updates to system processes that are now taking place within the Department, CPD will continue to work towards modernizing its systems, ensuring adequate staffing, and creating accountability within units at every opportunity to improve and streamline its records management and production processes.

Thank you for your communication on this matter. Please reach out to the Office of Legal Affairs with any additional questions.

Sincerely,

Dana O'Malley
General Counsel
Office of the Superintendent
Chicago Police Department

## MISSION

The City of Chicago Office of Inspector General (OIG) is an independent, nonpartisan oversight agency whose mission is to promote economy, efficiency, effectiveness, and integrity in the administration of programs and operations of City government. OIG achieves this mission through,

- administrative and criminal investigations by its Investigations Section;
- performance audits of City programs and operations by its Audit and Program Review Section;
- inspections, evaluations and reviews of City police and police accountability programs, operations, and policies by its Public Safety Section; and
- compliance audit and monitoring of City hiring and employment activities by its Hiring Oversight Unit.

From these activities, OIG issues reports of findings and disciplinary and other recommendations to assure that City officials, employees, and vendors are held accountable for violations of laws and policies; to improve the efficiency, cost-effectiveness government operations and further to prevent, detect, identify, expose and eliminate waste, inefficiency, misconduct, fraud, corruption, and abuse of public authority and resources.

## AUTHORITY

OIG's authority to produce reports of its findings and recommendations is established in the City of Chicago Municipal Code §§ 2-56-030(d), -035(c), -110, -230, and 240.

*Cover image courtesy of iStock.*

PROJECT TEAM
RICARDO ALVAREZ, PERFORMANCE ANALYST
DANIEL LOPEZ, SENIOR PERFORMANCE ANALYST
PATRICK TRAN, ASSISTANT INSPECTOR GENERAL

PUBLIC INQUIRIES:
COMMUNICATIONS: (773) 478-0534
COMMUNICATIONS@IGCHICAGO.ORG

TO SUGGEST WAYS TO IMPROVE CITY GOVERNMENT,
VISIT OUR WEBSITE:
IGCHICAGO.ORG/CONTACT-US/HELP-IMPROVE-CITY-GOVERNMENT

TO REPORT FRAUD, WASTE, AND ABUSE IN CITY PROGRAMS:
CALL OIG'S TOLL-FREE HOTLINE